Roberta L. LATHAN, Appellant,

v.

Jesse BROWN, Secretary of Veterans
Affairs, Appellee.

No. 93–62.

United States Court of Veterans Appeals.

Argued Sept. 20, 1994.

Decided Jan. 26, 1995.

360

Thomas Reed, for appellant.

Alice M. Fent, with whom Mary Lou Keener, Gen. Counsel, Norman G. Cooper, Asst. Gen. Counsel, and R. Randall Campbell, Deputy Asst. Gen. Counsel, Washington, DC, were on the pleadings, for appellee.

Before NEBEKER, Chief Judge, and KRAMER and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, Roberta Lathan, appeals a December 8, 1992, Board of Veterans' Appeals (BVA or Board) decision denying dependency and indemnity compensation (DIC) on the ground that the cause of death of her husband, veteran Hubert C. Lathan, was not service connected. Record (R.) at 19. A timely appeal to this Court followed. For the reasons that follow, the Court will vacate the Board decision and remand the matter for further development and readjudication.

## I. Background

The appellant, Roberta Lathan, is the widow of World War II veteran Hubert C. Lathan, who served on active duty in the U.S. Marine Corps from March 1942 until February 1946. R. at 26, 29, 32–33. He was wounded in action in Guam in July 1944. R. at 26. An August 1944 service medical record (SMR) described the wound as a "[p]enetrating wound of [the] left thorax with associated massive hemothorax" (a collection of blood in the pleural cavity, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 751 (27th ed. 1988) [hereinafter DORLAND'S]). R. at 44. A fragment of metal in the lower portion of the left lungfield was noted in a July 1944 SMR x-ray report. R. at 41.

Between August 1944 and August 1945, the veteran underwent chest aspiration twice and chest surgery three times. R. at 57–60. In January 1946, a Board of Medical Survey found him unfit for service, with a diagnosis of suppurative pleurisy (inflammation of the pleura, producing pus, DORLAND'S at 1309, 1614). R. at 62. He was discharged for disability in February 1946. R. at 82. In March 1946, he filed with a Veterans' Administration (now Department of Veterans Affairs) (VA) regional office (RO) an application for service-connected disability compensation for a shrapnel wound to his left chest. R. at 79–80. In November 1946, the VARO awarded service connection for residuals of left-pleural-cavity injury, rated 40% disabling, and damage to muscle group II, left, rated 20% disabling—for a combined rating of 50%. R. at 111. (As to combined ratings, when a veteran has more than one disability a combined disability rating is derived. Currently, combined ratings are derived from Table I, 38 C.F.R. § 4.25 (1994).)

Between 1946 and 1950, the veteran was hospitalized four times for medical complications of his service-connected injury and underwent two surgical procedures, including removal of a shell fragment from his left lung. R. at 119, 135, 205, 209, 221, 227. He required treatment for infections at the wound site. R. at 284, 290–91. During this time, his disability rating varied from 40% to 100%. R. at 115, 189.

A September 1951 intravenous pyelogram (an x-ray of the kidney and ureter, DORLAND'S at 1393, 1470) (IVP), showed essentially normal kidney functions. R. at 324. A VA physician's examination report noted in April 1952: "Heart: Not enlarged to percussion. Regular in rate, rhythm and force. No murmurs. Sounds of good quality." R. at 349. In June 1955, the BVA found that the residuals of the pleural cavity injury warranted a 40% rating and that the muscle-group-II injury warranted a 30% rating—for a combined rating of 60%. R. at 469–70.

In February 1963, the veteran was hospitalized at a VA facility for a duodenal ulcer with partial obstruction, idiopathic (of unknown causation, DORLAND'S at 815) diaphragmatic hernia, and chronic pancreatitis probably secondary to ulcer disease; surgery for these conditions was performed in April 1963. R. at 493, 495–500. He was hospitalized in a VA facility in September 1965 for fever of unknown origin and pain, and a summary VA medical report indicated that he had been hospitalized earlier that year in a private hospital where laboratory tests and an exploratory laparotomy had shown no abnormalities. R. at 513. (A laparotomy is an incision to gain access to the abdominal organs, DORLAND'S at 896, 1263, 1843.) A September 1965 VA medical certificate noted: "Heart is enlarged." R. at 509. An IVP and EKG performed during this hospitalization were normal. R. at 514. He was treated in the VA hospital with a cordotomy (interruption of the lateral spinothalamic tract of the spinal cord, DORLAND'S at 381) to relieve pain consistent with chronic pancreatitis, and was discharged in February 1966. R. at 513–14.

The veteran was hospitalized at a private facility from March 8 to March 15, 1979, for chronic obstructive pulmonary disease (COPD), congestive heart failure, and myocardial ischemia. R. at 605. In May 1979, VA denied reimbursement for the services rendered at the private facility. R. at 532. The veteran filed a Notice of Disagreement (NOD) in June 1979. R. at 534. A September 1979 examination report by Dr. Seymour Dayton, Chief of Staff at the San Diego, California, VA Medical Center (VAMC), stated:

There is no reason to regard that [March 1979] hospitalization to have been a consequence of the patient's residual pleural cavity injuries.... It is highly unlikely that the hospitalization was related to the patient's other service-connected disorder which is recorded as "residual wounds muscle group 2nd left." However, that appears to be an incomplete statement of the diagnosis, so I would not wish to be highly emphatic on the latter point.

R. at 537. In September 1979, VA asked Dr. Dayton for clarification of the last sentence and he replied that the description "residual wounds muscle group 2nd left" "doesn't identify the location or the extent of the injury". R. at 541.

From September 18 to 28, 1979, the veteran was admitted to a VAMC for atypical right chest pain and organic heart disease. R. at 562–65. An examining VA physician noted that the veteran's 30–year history of smoking two and one-half packs of cigarettes per day was a risk factor for heart disease. R. at 562. A November 16, 1979, report by Dr. William Jenson, Associate Chief of Staff, Ambulatory Care, at the San Diego VAMC, who had reviewed the veteran's records regarding his appeal, stated, in relevant part:

4. The patient gives a 30–year history of smoking two and one-half packs of cigarettes per day, which would likely account for the [COPD].

5. I would agree with the evaluation by Dr. Seymour Dayton that the present pulmonary and cardiac conditions would not be considered to be directly or primarily caused by his shrapnel chest wounds and subsequent thoracoplasty.

R. at 573.

The veteran appealed to the BVA for reimbursement of his private hospitalization costs and service connection for a heart condition secondary to and aggravated by the service-connected pleural condition. R. at 558–59. In April 1981, the Board (following remand to obtain records of the March 1979 hospitalization) denied service connection for a heart disorder as secondary to the veteran's service-connected pleural cavity residuals, and denied reimbursement for private hospitalization. R. at 581, 617–21.

In December 1981, the veteran filed a claim for a total disability rating based on individual unemployability (TDIU). R. at 624, 643. A February 1982 examination by VA physician Chris Matthews (also signed by Professional Services Coordinator Dr. David Miller), stated:

[Patient] is severely compromised [with] evidence on exam of severe LV dysfunction [and] also severe restrictive lung disease. I cannot say based on evidence available that heart disease is unrelated to injuries received previously; the diagnosis of congestive cardiomyopathy [general term designating primary myocardial disease, often of obscure or unknown etiology, DORLAND'S at 274] is usually idiopathic.

R. at 662.

In March 1982, the veteran filed an NOD following an RO decision denying an increased rating for pleural cavity residuals, secondary service connection for a heart condition, and TDIU. R. at 671, 674. At a hearing before the Board, Dr. Ralph Shabetai testified under oath, inter alia, that he was Chief of Cardiology at the VA hospital associated with a University of California Medical School, was board certified in cardiology, and had been treating the veteran for his heart condition for from eighteen months to two years. R. at 697–98. When asked to give his opinion on the relationship between the veteran's current heart condition and his in-service injury, Dr. Shabetai testified:

Of course the commonest cause [for failure of the heart muscles to contract properly] one looks for in a man of his age is arteriosclerosis, or coronary heart disease. Now the studies showed that his coronary arteries are perfectly normal. . . .

So then we look for other causes of . . . failure of the heart muscles to shorten and contract properly. . . . And you draw a blank on all of these. . . .

Now you go back to his history and you find that during the war he had major chest injuries with involvement of foreign bodies in his chest and in his heart muscles, and this required multiple surgical explorations to deal with, and so, each time the heart is injured, each time the chest is explored, there is a risk of damage to the

heart muscles. So that the more I thought about it is [sic], that while one cannot put [sic] a hundred per cent, say, that the injuries caused the heart muscle weakness, one can in no way rule that out, because you have a mysterious unexplained heart failure and after intensive studies, including heart catheterization, all the normal causes for that have been ruled out.

R. at 698–99. When asked to comment on whether the veteran's COPD could be secondary to the restrictive lung disease he had from his in-service injury, Dr. Shabetai testified:

[T]he end result is they [COPD and restrictive lung disease] add up together to account for his shortness of breath. So the shortness of breath that he has from obstructive airway disease is aggravated and made worse and made more significant because there finally will come a pathway of both lung disease and shortness of breath. . . .

. . . .

The fact [is] that his lungs are, that his breathing is[,] greatly impaired by these two things [COPD and restrictive lung disease], plus of course, and let us not forget, [that] the major manifestation of his heart disease is also a limitation on his ability to breathe.

R. at 700–01. When asked if the veteran could maintain "any sort of gainful employment", Dr. Shabetai testified:

It would clearly be out of the question for him to go to work. . . . [The frequency of medical treatment required] is a measure of how difficult it is to keep him out of completely from [sic] uncompensated heart failure, that's what it takes, adjusting his medicine, checking everything, that's what it takes to keep him out of the hospital. So it really is a trick to keep him comfortable at home doing what he does now, but if he had to do any physical output of energy . . . he couldn't even try that.

R. at 701.

In August 1982, the Board obtained an independent medical opinion (IMO), from Dr. Martin Frank, Professor of Medicine, Chief, Section of Cardiology, School of Medicine,

Medical College of Georgia, on the questions of the correct diagnosis of the veteran's cardiac disorder and the causal relationship, if any, between the veteran's heart condition and the service-connected pleural injuries. R. at 714. Dr. Frank opined:

Further review of the record does not reveal anything that would suggest that the veteran has anything other than an idiopathic congestive cardiomyopathy. While the etiology of this is unclear, there is no evidence that this problem is related to his service-connected battle wounds sustained in 1944. In particular, it should be noted that between 1944 and 1979, nothing to indicate involvement of the left heart, which might suggest traumatic injury to the left ventricle, was reported. Moreover, such an injury should produce segmental dysfunction of the ventricle rather than global dysfunction....

In summary, no evidence exists that the patient's current cardiac disorder, which is of unknown cause in the vast majority of patients, is secondary to a service-connected chest injury. I believe that this is the only conclusion that a cardiologist would be able to make from the evidence provided. However, since the etiology of congestive cardiomyopathy is unknown in the vast majority of cases, a relationship between the prolonged infections secondary to the war injuries and the secondary development of left ventricular dysfunction cannot be totally excluded.

R. at 718–19.

In November 1982, the Board denied, on the following grounds, service connection for the veteran's heart disorder: Examinations prior to 1979 had not found evidence of left-side heart disease or traumatic injury to the heart; the IMO had stated that a traumatic injury would produce a segmental rather than a global dysfunction of the left ventricle; the infections in the veteran's lungs had been healed for many years; and he apparently had fairly good lung function at the time the cardiomyopathy was discovered. R. at 733. The Board granted entitlement to service connection for restrictive lung disease and remanded the case for the RO to determine whether the veteran was unemployable due to his service-connected disabilities. R. at 733, 735.

A February 1983 RO decision, effective December 1981, awarded compensation for residuals of pleural-cavity injuries with restrictive pulmonary disease, rated at 60% disabling, and residuals from a "gunshot [sic] wound" to muscle group II, rated at 30% disabling—for a combined rating of 70%, and denied entitlement to TDIU. R. at 753. In an August 1983 decision, the Board denied TDIU, finding that although the veteran's service-connected disabilities did cause an employment handicap they were not severe enough to preclude all forms of substantially gainful employment. R. at 811–12.

In May 1984, the veteran sought to reopen his claims for heart disorder and TDIU after obtaining a medical opinion from a private physician, Dr. Dennis Costello (board certified in cardiovascular disease) who reviewed the veteran's medical records, examined the veteran, and concluded:

The etiology of congestive cardiomyopathy, when not occurring in the setting of coronary disease, is presently unclear. The possibility at least exists that the cardiomyopathy may have been the result of persistent cardiac insults occurring at the time of his many surgeries or during his recovery period.

As you no doubt know, such cardiomyopathies appear over a long period of time and, thus, the precipitating factors may not be readily obvious.

R. at 815. In a May 1984 decision, the RO found that Dr. Costello's statement, while new, was of "insufficient probative value to warrant reopening" the TDIU and secondary service-connection claims because it was speculative. R. at 818. (The term "reopening" is misapplied regarding the TDIU claim; the Court has held that a TDIU claim is an original claim. *Abernathy v. Principi*, 3 Vet. App. 461 (1992).) In October 1984, the veteran filed an NOD (R. at 823), but the record reveals no further adjudicative activity.

The veteran died on April 26, 1991, of cardiac arrest due to idiopathic cardiomyopathy, with renal failure listed as a significant condition contributing to death. R. at 832.

In May 1991, the appellant applied for DIC. R. at 843. In July 1991, the RO denied DIC on the ground that the veteran's fatal heart and kidney problems were not service connected and that "[n]either is it shown that the veteran's [service-connected] ... injuries ... contributed materially or substantially to [his] death. R. at 886–87. In August 1991, the appellant filed an NOD in which she contended that the veteran's service-connected disabilities were directly connected to his death. R. at 892. She submitted an October 1983 letter, from Dr. J. Edwin Atwood, Director, Cardiac Catheterization Laboratory at a VA facility, stating:

> [The veteran's] chest x-ray continues to be markedly abnormal, partly because of his thoracoplasty and in addition signs of congestive heart failure.... Needless to say he is completely disabled from his cardiac disease, and certainly his cardiac condition could be secondary to his shrapnel injury—possibly involving his myocardium or pericardium, or possibly secondary to pulmonary hypertension.

R. at 905. An April 1991 autopsy report made no mention of any shrapnel fragments in the veteran's body. R. at 909–16.

In a December 1991 hearing before the Board, the appellant testified under oath that, following the surgery where the shrapnel was removed from the veteran's chest, "the doctor handed [a piece of shrapnel] to me himself and told me that it had lodged in the heart muscle", and that "the doctor up there at Van Nuys said there [were] tiny, tiny pieces left about as big as a pinhead that they couldn't even get". R. at 924. She also testified that in 1979 the veteran had experienced difficulty breathing and "couldn't walk very far". R. at 933. In December 1991, the hearing officer found that the service-connected respiratory condition may have had some effect, but not a material one, on the veteran's overall physical condition at the time of his death, and that the non-service-connected cardiac condition was severe enough to have produced death by itself. R. at 937. The appellant then submitted a February 1992 letter from Dr. Shabetai, stating:

> It was felt that some of the shrapnel may have lodged in his myocardium at the time of his injury in 1944, but at the time of autopsy, none was found. It is possible[,] however, that shrapnel lodged temporarily in the myocardium and subsequently migrated elsewhere in the body.... [A]t autopsy, he was found not to have coronary artery disease.... The cardiomyopathy may have been idiopathic (of no known cause), but one cannot rule out that it was associated with the prior major chest trauma and its treatment.

R. at 948.

In the December 8, 1992, BVA decision here on appeal, the Board denied entitlement to service connection for the cause of the veteran's death, finding that the preponderance of the evidence was against the claim. R. at 12. The Board stated:

> When the record was reviewed by the independent medical expert [Dr. Frank] in 1982, he determined that although a relationship between prolonged infections secondary to the chest wall injuries and the secondary development of left ventricular dysfunction could not be totally excluded, there was no evidence showing that the veteran's cardiac disorder was secondary to the service-connected chest injury. This was essentially the same opinion expressed by two VA physicians [Drs. Dayton and Jenson] in 1979.

> Dr. Costello, a board-certified cardiologist reviewed the claims folder in May 1984 and stated that "the possibility at least exists" that the cardiomyopathy was the result of cardiac insults which occurred at the time of the veteran's many surgeries during his recovery period. However, a mere possibility does not warrant the application of the benefit of the doubt doctrine....

> The February 1992 communication from [Dr. Shabetai] has also been considered, but the comments from the physician are conjectural in nature, with the physician merely opining that one "cannot rule out" an association of cardiomyopathy with the veteran's chest trauma and its treatment.

R. at 18–19. The Board concluded that cardiomyopathy and renal disease were the causes of death; that "[n]either cardiomyopathy nor renal disease was present in service

or within a year thereof"; that "[t]he veteran's service-connected disabilities did not combine in any way to cause his death, nor did they play a significant role in hastening his death"; and that "[t]he service-connected disorders did not cause or contribute substantially or materially to cause death." R. at 12–13.

## II. Analysis

■ When a veteran dies from a service-connected disability, the veteran's surviving spouse may be eligible for DIC. *See* 38 U.S.C. § 1310; 38 C.F.R. § 3.5(a) (1994). A veteran's death is due to a service-connected disability when evidence establishes that such disability was either the principal or a contributing cause of death. *See* 38 C.F.R. § 3.312 (1994). Specifically, as to contributory causes of death, VA regulations provide:

(3) Service-connected diseases or injuries involving active processes affecting vital organs should receive careful consideration as a contributory cause of death, the primary cause being unrelated, from the viewpoint of whether there were resulting debilitating effects and general impairment of health to an extent that would render the person materially less capable of resisting the effects of other disease or injury primarily causing death. . . .

(4) There are primary causes of death which by their very nature are so overwhelming that eventual death can be anticipated irrespective of coexisting conditions, but, even in such cases, there is for consideration whether there may be a reasonable basis for holding that a service-connected condition was of such severity as to have a material influence in accelerating death. In this situation, however, it would not generally be reasonable to hold that a service-connected condition accelerated death unless such condition affected a vital organ and was itself of a progressive or debilitating nature.

38 C.F.R. § 3.312(c). A claim for DIC is treated as a new claim (*see* 38 C.F.R. § 20.1106 (1994); *Zevalkink v. Brown,* 6 Vet. App. 483, 491 (1994)); therefore, the claim must be well grounded.

## A. Well–Grounded Claim

■ The Secretary contends that the appellant's claim is not well grounded. Section 5107(a) of title 38, U.S.Code, provides in pertinent part: "[A] person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." The Court has defined a well-grounded claim as follows: "A well-grounded claim is a plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of [section 5107(a) ]." *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990). In addition, the Court held in *Tirpak v. Derwinski,* 2 Vet.App. 609, 611 (1992) (quoting section 5107(a)), that to be well grounded a claim must be accompanied by supportive evidence and that such evidence "must 'justify a belief by a fair and impartial individual' that the claim is plausible." Where the determinative issue involves either medical causation or a medical diagnosis, competent medical evidence is required to fulfill the well-grounded-claim requirement of section 5107(a); where the determinative issue does not require medical expertise, lay testimony may suffice by itself. *See Grottveit v. Brown,* 5 Vet.App. 91, 93 (1993); *see also Espiritu v. Derwinski,* 2 Vet.App. 492, 494–95 (1992). The threshold of plausibility to make a claim well grounded is considerably lower than the threshold for new and material evidence to justify reopening a claim. *See Robinette v. Brown,* —— Vet.App. ——, ——, No. 93–985, slip op. at 10–11, 1994 WL 495078 (Sept. 12, 1994), *mot. for recons. granted on other grounds* (Oct. 21, 1994). A Board determination whether a claim is well grounded is a conclusion of law subject to de novo review by the Court under 38 U.S.C. § 7261(a)(1). *See Grottveit, supra.*

The Secretary argues that the claim is not well grounded under *Tirpak, supra,* because the medical evidence of a connection between the veteran's cause of death and the injuries he suffered in service is speculative. Brief (Br.) at 13–15. In *Tirpak,* a widow was seeking service connection for the cause of

death of her husband, who had died from a heart attack. He had suffered deformities of the tongue and jaw as a result of service-connected injuries, and these deformities had prevented paramedics and the treating physician at the hospital from intubating him. The medical evidence that the failure to intubate him had caused or contributed to his death consisted solely of a statement from the treating physician that "[i]f intubation had been successful, Mr[.] Tirpak may or may not have survived the cardiac arrest." *Tirpak*, 2 Vet.App. at 610.

*Tirpak* is distinguishable from the instant case in two ways. First, the physician in *Tirpak* made a statement to the effect that he did not have or could not state an opinion, whereas in this case, five physicians (Drs. Matthews, Miller, Shabetai, Costello, and Atwood) stated their opinions that a causal connection was possible, although less than certain. Medicine is more art than exact science, and *Tirpak* does not stand for the proposition that a medical opinion must be expressed in terms of certainty in order to serve as the basis for a well-grounded claim. Also, here all the medical evidence was consistent in the view that the cardiomyopathy that caused the veteran's fatal heart failure was of no known cause, and most of the medical evidence (six of eight physicians) agreed that medical science could not "rule out" an association between that cardiomyopathy and the veteran's service-connected chest trauma and its prolonged and traumatic treatment.

Second, in *Tirpak* the appellant argued that the service-connected condition was the direct cause of death. In the instant case, the appellant argues that the BVA failed to consider adequately the regulations on contribution of a service-connected condition to the cause of death. Under 38 C.F.R. § 3.310(a) (1994), service connection is to be awarded for a condition if it is proximately due to or the result of a service-connected condition. Under 38 C.F.R. § 3.312(a) and (c), a veteran's death will be considered service connected when a service-connected condition was a "contributory" cause of death, that is, where the service-connected condition or conditions were causally connected to the

death and "contributed substantially or materially" to the death, "combined to cause death", "aided or lent assistance to the production of death", or had "a material influence in accelerating death". Under § 3.312(c)(3) and (4), special consideration must be given to a service-connected disease process affecting a vital organ to determine if that disease process was a contributory cause of death or had a material influence in accelerating death. In Dr. Shabetai's 1982 testimony, he stated unequivocally that the veteran's service-connected restrictive lung disease combined with the veteran's COPD to produce a more severe breathing problem than either one would have produced alone, and Dr. Shabetai identified the veteran's breathing problem as a factor that made it difficult to keep the veteran out of heart failure (the ultimate cause of death). R. at 700–01.

In *Grottveit, supra*, the claimant presented only lay evidence of causation, and presented *no* medical evidence of causation whatsoever. In the instant case, the appellant did present medical evidence—indeed considerable such evidence—relating to causation: Dr. Shabetai's 1982 testimony and the statements of four other physicians as to the possibility of a causal link between the appellant's service-connected condition and his heart failure due to idiopathic cardiomyopathy. Whether or not such medical evidence would be enough to reopen a claim, *see Robinette, supra*, the Court holds that this medical evidence, coupled with the special emphasis VA regulation § 3.312(c)(3) places on "careful consideration" of the possibility that service-connected injuries "affecting vital organs" may have resulted in "debilitating effects . . . that would render the person materially less capable of resisting the effects of other disease or injury primarily causing death", is enough to make the claim "plausible", "capable of substantiation", under *Grottveit* and *Murphy*, both *supra*. The Court thus holds that the claim was well grounded.

### B. Duty to Assist

■ Once a claimant has submitted a well-grounded claim, VA has an affirmative duty to "assist . . . in developing the facts pertinent to the claim." 38 U.S.C. § 5107(a); *see*

*Masors v. Derwinski,* 2 Vet.App. 181, 186 (1992). The appellant asserts that VA failed in its duty to assist her in developing medical evidence; specifically, "the facts regarding the contribution of Mr. Lathan's lung condition to his death or the acceleration of his death and the exploration of alternative factors which may have contributed to his cardiomyopathy." Br. at 19. The appellant cites *EF v. Derwinski,* 1 Vet.App. 324 (1991), and *Sheets v. Derwinski,* 2 Vet.App. 512, 517 (1992). In *EF,* where a claim of psychiatric illness had been made and no VA psychiatric examination was in the record on appeal, the Court remanded for the RO to obtain a comprehensive psychiatric examination. *EF,* 1 Vet.App. at 326. In *Sheets,* the Court remanded for, inter alia, an advisory medical opinion on the issue of causation of the veteran's death. *Sheets,* 2 Vet.App. at 517.

The record on appeal contains medical examination reports from six VA physicians. The reports address the issue of causal connection between the veteran's service-connected lung condition and his heart condition, but the reports do not specifically address the application of 38 C.F.R. § 3.312(c). These medical opinions deal with the question whether the veteran's service-connected conditions caused his heart condition, but they do not deal with the questions whether there were "debilitating effects" due to service-connected conditions that made the veteran "materially less capable of resisting the effects" of his heart condition, or whether his service-connected restrictive lung disease had a "material influence in accelerating death".

The Court holds that remand of this matter is necessary for VA to obtain a medical opinion which will enable it to give "careful consideration", as required by 38 C.F.R. § 3.312(c), to the issue of any contribution of the veteran's service-connected lung condition to his death. *See* 38 U.S.C. §§ 5107(a), 7109; 38 C.F.R. § 20.901(a), (d) (1994); *Austin v. Brown,* 6 Vet.App. 547, 552–54 (1994); *Quiamco v. Brown,* 6 Vet.App. 304, 310 (1994); *Littke v. Derwinski,* 1 Vet.App. 90, 92 (1990). The medical opinion should address specifically the issue whether the veteran's service-connected disability was a contributory cause of death under 38 C.F.R. § 3.312(c). In ordering a medical opinion, VA should consider the feasibility of requesting that the physician express in percentage terms the probability that the veteran's service-connected disability caused or contributed to death.

### C. Reasons or Bases

█ The record contains eight opinions by eight physicians on the issue whether the veteran's heart condition was related to the veteran's in-service injuries. The Board summarized the reports of all of the physicians except Dr. Atwood. R. at 15–18. The Board then discussed the weight it assigned to the reports from Drs. Frank, Dayton, Jenson, Costello, and the 1992 report from Dr. Shabetai, but the Board did not discuss its evaluation of the reports from Drs. Atwood and Matthews/Miller, or the 1982 testimony of Dr. Shabetai. R. at 18–19. The latter three opinions provided the evidence that is arguably the most favorable to the veteran. It is not enough for the Board merely to summarize what a physician stated without actually discussing why the Board did or did not find that statement persuasive. The Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the veteran. *See Gabrielson v. Brown,* 7 Vet.App. 36, 39–40 (1994); *Smith (Morgan) v. Derwinski,* 2 Vet.App. 137, 141 (1992) (Board is not free to ignore opinion of a treating physician).

█ Furthermore, where there is "significant" evidence in support of the appellant's claim, the Board "must provide a satisfactory explanation as to why the evidence was not in equipoise". *Williams (Willie) v. Brown,* 4 Vet.App. 270, 273–74 (1993) (*citing Gilbert v. Derwinski,* 1 Vet.App. 49, 53 (1990)). In *Gilbert,* 1 Vet.App. at 59, the Court held that the Board must evaluate the positive evidence, weigh the positive and negative evidence, and give more than a conclusory statement that the benefit-of-the-doubt rule does not apply. Here, the Board discussed five of the eight medical opinions, and then stated: "The preponderance of the evi-

dence is against the claim." R. at 19. This conclusory statement violates the *Gilbert* duty to do more than merely say that the benefit-of-the-doubt rule does not apply, particularly in light of the Board's failure to discuss three of the opinions of four of the physicians.

■ Finally, the Court notes that, although the BVA decision cited 38 C.F.R. § 3.312 (R. at 13), the Board did not *discuss* the application of that regulation. Indeed, the Board's conclusion that "there is no tenable basis for holding that there was a causal connection between the veteran's service-connected disabilities and the cause of his death" (R. at 19) does not appear to have included consideration of 38 C.F.R. § 3.312(c). The Board must "acknowledge *and consider*" all potentially relevant regulations. *Schafrath v. Derwinski,* 1 Vet.App. 589, 593 (1991) (emphasis added). In its decision on remand, the Board must include an adequate statement of reasons or bases, including discussion of all material evidence and all material issues of fact and law presented on the record; the statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court if the BVA decision is appealed here. *See* 38 U.S.C. § 7104(d)(1); *Gabrielson, supra; Masors,* 2 Vet.App. at 188; *Gilbert, supra.*

### D.  *Accrued–Benefits Claim*

■ Pursuant to 38 U.S.C. § 5101(b), a claim for DIC includes a claim for accrued benefits. *See Satchel v. Derwinski,* 1 Vet. App. 258, 259–60 (1991); *see also Isenhart v. Derwinski,* 3 Vet.App. 177, 179 (1992). An accrued benefit is a periodic payment "to which [the veteran] was entitled at death under existing ratings or decisions, or ... based on evidence in the file at date of death...." 38 U.S.C. § 5121(a); *see Hayes v. Brown,* 4 Vet.App. 353, 360–61 (1993) (Court held that "evidence in the file at date of death" may include private hospital and examination reports submitted after date of death); *see generally Zevalkink, supra.* In addition, 38 U.S.C. § 5121(c) provides as to accrued-benefits claims: "If a claimant's application is incomplete at the time it is origi-

nally submitted, the Secretary shall notify the claimant of the evidence necessary to complete the application."

The Board in the instant case did not address accrued benefits in its decision, even though the appellant's DIC claim is to be considered to include an accrued-benefits claim if supported by the facts of the case, *see Satchel, supra,* and there was considerable evidence of record at the time of the veteran's death that he had been unemployable for some time (R. at 662, 701, 719, 905, 930–33), which might give rise to an accrued-benefits TDIU claim under 38 C.F.R. § 4.16 (1994). The Court cannot determine, with any degree of certainty, from the record on appeal whether there was evidence in the veteran's file at death that would support an accrued-benefits claim. If the file did not contain at death sufficient evidence to adjudicate the accrued-benefits claim included in the appellant's DIC application, then the Board should have determined whether VA had failed in its obligation under section 5121(c) to notify her "of the evidence necessary to complete the application". *Cf. Isenhart, supra.* The Board did not address either of these matters and should do so on remand.

### III.  Conclusion

The Court affirms the December 8, 1992, BVA decision insofar as it found that the appellant's claim was well grounded. The Court vacates the decision and remands the matter for expeditious fulfillment of the duty to assist and for expeditious readjudication thereafter—all consistent with this opinion and with section 302 of the Veterans' Benefits Improvements Act of 1994, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (Nov. 2, 1994) (Secretary "shall take such actions as may be necessary to provide for the expeditious treatment, by the [BVA] and by the [ROs], of any claim that has been remanded by the [BVA] or by the ... Court"). *See* 38 U.S.C. §§ 1310, 5101(b), 5107(a), 5121(a), 7104(d); 38 C.F.R. §§ 3.310, 3.312, 4.16; *Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991). A final decision by the Board following the remand herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of

a new Notice of Appeal with the Court not later than 120 days after the date on which notice of that new decision is mailed to the appellant.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.