Citation Nr: 1045630 
Decision Date: 12/06/10 Archive Date: 12/14/10

DOCKET NO. 07-15 031 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs (VA) Regional Office (RO) 
in Pittsburgh, Pennsylvania


THE ISSUE

Entitlement to service connection for cause of death.


REPRESENTATION

Appellant represented by: Veterans of Foreign Wars of the 
United States


ATTORNEY FOR THE BOARD

G. Jackson, Counsel



INTRODUCTION

The Veteran served on active duty from November 1942 to August 
1945. He died in August 2005; the appellant is his surviving 
spouse. 

This matter initially came before the Board of Veterans' Appeals 
(Board) on appeal from an April 2007 rating decision issued by 
the RO. In a January 2010 decision, the Board remanded the 
matter for further development of the record.

The Board reiterates that in the November 2009 Informal Hearing 
Presentation, the appellant also filed claims for clear and 
unmistakable error (CUE) in a December 1946 rating decision for 
failing to rate the fracture of the ulna (MG VII and VIII) and 
CUE in a June 1953 rating decision for failure to assign an 
effective date prior to April 9, 1953 for the award of a 30 
percent rating for the MG III. As these claims have yet to be 
addressed by the RO, the Board is again referring them to the RO 
for initial consideration and appropriate action. Godfrey v. 
Brown, 7 Vet. App. 398 (1995).


FINDINGS OF FACT

1. The Veteran died in August 2005 as a result of end stage 
renal failure.

2. The persuasive evidence of record demonstrates a disease or 
injury which caused or contributed to the Veteran's death was not 
incurred in or aggravated by service.






CONCLUSION OF LAW

A service-connected disability did not cause or contribute 
substantially or materially to cause the Veteran's death. 38 
U.S.C.A. §§ 1110, 1116, 1310, 5103, 5103A, 5107 (West 2002 & 
Supp. 2009); 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.312 (2010).


REASONS AND BASES FOR FINDINGS AND CONCLUSION

The provisions of the Veterans Claims Assistance Act of 2000 
(VCAA), codified at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 
3.326(a), and as interpreted by the United States Court of 
Appeals for Veterans Claims (the Court) have been fulfilled by 
information provided to the appellant in correspondence from the 
RO dated in November 2005 and January 2010. These letters 
notified the appellant of VA's responsibilities in obtaining 
information to assist the appellant in completing her claim and 
identified the appellant's duties in obtaining information and 
evidence to substantiate her claim. (See 38 C.F.R. §§ 3.102, 
3.156(a), 3.159, 3.326(a)), Quartuccio v. Principi, 16 Vet. App. 
183 (2002), Pelegrini v. Principi, 18 Vet. App. 112 (2004). See 
also Mayfield v. Nicholson, 19 Vet. App. 103, 110 (2005), 
reversed on other grounds, 444 F.3d 1328 (Fed. Cir. 2006), 
Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006); Mayfield 
v. Nicholson (Mayfield II), 20 Vet. App. 537 (2006); Hupp v. 
Nicholson, 21 Vet. App. 342 (2007). 

The appellant has been made aware of the information and evidence 
necessary to substantiate her claim and has been provided 
opportunities to submit such evidence. The RO has properly 
processed the appeal following the issuance of the required 
notice. Moreover, all pertinent development has been undertaken, 
a medical opinion was issued, and all available evidence has been 
obtained in this case. Thus, the content of the notice letter 
complied with the requirements of 38 U.S.C.A. § 5103(a) and 
38 C.F.R. § 3.159(b). No further action is necessary for 
compliance with the VCAA. 
During the pendency of this appeal, the Court in Dingess/Hartman 
found that the VCAA notice requirements applied to all elements 
of a claim. Notice as to these matters was provided in the 
January 2010 letter. The notice requirements pertinent to the 
issue addressed in this decision have been met and all identified 
and authorized records relevant to the matter have been requested 
or obtained.

Further attempts to obtain additional evidence would be futile. 
The Board finds the available medical evidence is sufficient for 
an adequate determination. There has been substantial compliance 
with all pertinent VA law and regulations and to move forward 
with the claim would not cause any prejudice to the appellant.

Laws and Regulations

Cause of Death 

(a) General. The death of a veteran will be considered as having 
been due to a service-connected disability when the evidence 
establishes that such disability was either the principal or a 
contributory cause of death. The issue involved will be 
determined by exercise of sound judgment, without recourse to 
speculation, after a careful analysis has been made of all the 
facts and circumstances surrounding the death of the veteran, 
including, particularly, autopsy reports. 
(b) Principal cause of death. The service-connected disability 
will be considered as the principal (primary) cause of death when 
such disability, singly or jointly with some other condition, was 
the immediate or underlying cause of death or was etiologically 
related thereto. 
(c) Contributory cause of death. 
(1) Contributory cause of death is inherently one 
not related to the principal cause. In determining 
whether the service-connected disability contributed 
to death, it must be shown that it contributed 
substantially or materially; that it combined to 
cause death; that it aided or lent assistance to the 
production of death. It is not sufficient to show 
that it casually shared in producing death, but 
rather it must be shown that there was a causal 
connection. 
(2) Generally, minor service-connected disabilities, 
particularly those of a static nature or not 
materially affecting a vital organ, would not be held 
to have contributed to death primarily due to 
unrelated disability. In the same category there 
would be included service-connected disease or 
injuries of any evaluation (even though evaluated as 
100 percent disabling) but of a quiescent or static 
nature involving muscular or skeletal functions and 
not materially affecting other vital body functions. 
(3) Service-connected diseases or injuries involving 
active processes affecting vital organs should 
receive careful consideration as a contributory cause 
of death, the primary cause being unrelated, from the 
viewpoint of whether there were resulting 
debilitating effects and general impairment of health 
to an extent that would render the person materially 
less capable of resisting the effects of other 
disease or injury primarily causing death. Where the 
service-connected condition affects vital organs as 
distinguished from muscular or skeletal functions and 
is evaluated as 100 percent disabling, debilitation 
may be assumed. 
(4) There are primary causes of death which by their 
very nature are so overwhelming that eventual death 
can be anticipated irrespective of coexisting 
conditions, but, even in such cases, there is for 
consideration whether there may be a reasonable basis 
for holding that a service-connected condition was of 
such severity as to have a material influence in 
accelerating death. In this situation, however, it 
would not generally be reasonable to hold that a 
service-connected condition accelerated death unless 
such condition affected a vital organ and was of 
itself of a progressive or debilitating nature. 
38 C.F.R. § 3.312 (2010)

In order to be a contributory cause of death, it must be shown 
that there were "debilitating effects" due to a service-connected 
disability that made the veteran "materially less capable" of 
resisting the effects of the fatal disease or that a service-
connected disability had "material influence in accelerating 
death," thereby contributing substantially or materially to the 
cause of death. See Lathan v. Brown, 7 Vet. App. 359 (1995); 38 
C.F.R. § 3.312(c)(1).

The Court has held that "where the determinative issue involves 
medical causation or a medical diagnosis, competent medical 
evidence is required." Grottveit v. Brown, 5 Vet. App. 91, 93 
(1993). The Federal Circuit has recognized the Board's 
"authority to discount the weight and probity of evidence in 
light of its own inherent characteristics and its relationship to 
other items of evidence." Madden v. Gober, 125 F.3d 1477, 1481 
(Fed. Cir. 1997).

It is the policy of VA to administer the law under a broad 
interpretation, consistent with the facts in each case with all 
reasonable doubt to be resolved in favor of the claimant; 
however, the reasonable doubt rule is not a means for reconciling 
actual conflict or a contradiction in the evidence. 38 C.F.R. § 
3.102.

Factual Background and Analysis

In this case, the appellant contends that the Veteran's death in 
August 2005 as a result of end stage renal failure was caused or 
materially affected by his active service. In this regard, the 
appellant claimed the Veteran's death was the result of a blood 
transfusion he received in service as a result of being wounded 
in action.

Service treatment records report the Veteran was shot in action 
in September 1944, near Corigliano, Italy, sustaining a 
perforating wound of the right chest and right forearm with 
fractures of the 8th right rib and right ulna. He had a sucking 
wound of the chest and developed a hemopneumothorax of the right 
chest cavity. The wounds were debrided and a cast was applied to 
the right arm. The service treatment records further document 
that while being treated for these injuries, the Veteran received 
a transfusion of 500 cc of blood.

Subsequent to service, the Veteran received treatment for his 
various disorders, including chronic renal failure, hepatitis C 
and cirrhosis. An April 1996 private treatment record indicates 
the Veteran was currently a non-drinker, having stopped drinking 
in 1965. A May 2001 private treatment report indicates that the 
Veteran, in pertinent part, had a history of cirrhosis secondary 
to alcohol abuse.

In a September 2001 private treatment record, the Veteran 
received treatment for "increased bruise ability in patient with 
known pancytopenia." The Veteran was accompanied to the 
examination by his wife and daughter and it was reported that all 
three were "pleasant, cooperative and reliable informants." It 
was also noted that extensive records were reviewed in detail. 

The physician noted that the Veteran had been receiving treatment 
for pancytopenia for several years. The physician reported that 
the Veteran had a history of cirrhosis with ascites. In this 
regard, the physician reported that the "cirrhosis has been 
attributed to chronic hepatitis C virus infection, possibly 
related to multiple blood transfusions received during the 
Italian campaign in World War II when he was hit by six 
submachine gun bullets at close range in the right chest and 
right arm. He also consumed a 'prodigious' quantity of alcohol 
during his life although that use has significantly decreased 
recently." The physician also documented the history of chronic 
renal failure. On objective examination, relevant diagnoses 
included chronic renal failure and cirrhosis presumably due to 
hepatitis C plus alcohol.

In an August 2005 private treatment record, the Veteran was 
admitted with main diagnoses, in pertinent part, of hypertensive 
renal disease with renal failure, alcoholic cirrhosis of the 
liver, unspecified viral hepatitis with hepatic coma. During the 
hospital course, it was documented, in pertinent part, that the 
Veteran had end stage renal disease on dialysis; He was found to 
have ascites and questionable cirrhosis.

Subsequently, the Veteran transferred to another private medical 
facility for treatment. An August 2005 treatment record reports 
the Veteran's past medical history, including chronic renal 
failure for which the Veteran was dialysis dependent. The 
Veteran's daughter who accompanied the Veteran indicated it was 
due to overdosing of arthritis medications; however, the private 
physician reported that other private medical records indicated 
renal toxicity of moonshine as the cause along with 
nephrosclerosis. The physician noted that it was known that the 
Veteran had chronic cirrhosis and was hepatitis C positive. 
Additionally, it was noted that the Veteran ingested large 
amounts of alcohol over the years, which could have contributed 
to cirrhosis and led to portal hypertension which currently 
manifested with thrombocytopenia and associated ascites. The 
physician further noted that the Veteran had a history of ethanol 
abuse in the past and was apparently a big moonshine drinker. 

In summary, the physician documented a "very, very colorful 
history of major alcohol use in the past" with current 
indication of the Veteran having an occasional beer. On 
objection examination, the impression, in pertinent part, was 
hepatitis C positive status with cirrhosis of the liver due to 
alcohol and hepatitis C and associated ascites and remote ethanol 
abuse, including moonshine.

In a March 2006 statement, a private physician reported that he 
had treated the Veteran for several years. The physician noted 
that the Veteran sustained a gunshot wound to the right lung 
during his period of service. As a result, the Veteran required 
blood transfusions that were later determined to be positive for 
the hepatitis C virus. To the physician's knowledge, the Veteran 
did not have any other risk factors for contraction of the virus 
at the time of testing positive. Thus, the physician concluded 
that the Veteran developed cirrhosis of the liver with subsequent 
hepatorenal syndrome and eventually end-stage renal disease 
requiring hemodialysis. The Veteran subsequently developed 
recurrent sepsis which was related to dialysis catheter 
infections, culminating in a septic episode that ultimately 
resulted in his death. Thus the examiner opined that the 
underlying cause of the Veteran's death was directly a result of 
the injury that the Veteran sustained during his service time.

In March 2007, a VA examiner was asked to opine as to whether the 
Veteran had hepatitis C, as a result of blood transfusions that 
he received in service due to injuries sustained during his 
period of service in World War II, which ultimately led to his 
chronic renal failure that resulted in his death. The examiner 
indicated that the claims file had been reviewed and found no 
clear indication that the Veteran had hepatitis C. In this 
regard, the examiner noted that certain records indicated that 
the Veteran had hepatitis C; however, the records did not contain 
laboratory data showing findings of hepatitis C. Further, there 
was no mention of the Veteran's hepatitis viral load. To that 
end, the examiner explained that in some instances, people could 
clear hepatitis C but would always be antibody positive. In this 
regard, people who clear hepatitis C would not have any long-term 
complication of hepatitis C. 

Thus, the examiner could not determine if the Veteran had 
hepatitis C that was the cause of his renal failure. To make 
such a determination, it would need to be determined if the 
Veteran had a positive hepatitis C viral load; and, if the 
Veteran had cirrhosis, established by CT scan. A determination 
of whether the Veteran's renal disease was related to hepatorenal 
syndrome could not be made otherwise.

In compliance with the January 2010 Board remand, a VA medical 
opinion was obtained to determine whether there was at least a 50 
percent probability or greater (at least as likely as not) that 
the Veteran's disabilities caused or contributed to cause his 
death. To that end, the examiner was requested to determine 
whether the Veteran was given a blood transfusion in service that 
at least as likely as not resulted in the renal disorders that 
caused the Veteran's death.
In the July 2010 VA Medical Center (VAMC) opinion report, the 
nurse practitioner (approved by the medical doctor) indicated 
that the claims file had been reviewed and she documented the 
findings of these records. The examiner found that review of the 
service treatment records confirmed that the Veteran suffered 
gunshot wound in service, sustaining a perforating wound of the 
right chest and right forearm. The wounds were debrided and a 
cast was applied to the right arm and the Veteran eventually had 
a throcentesis to drain the hemothorax (blood collection) in the 
lung and re-expand the lung. At that time, the Veteran's 
hematocrit and hemoglobin were 25 and 8.5, respectively. 
Subsequently, the Veteran received 500 cc of blood and his 
subsequent hematocrit and hemoglobin were 39.5% and 13.4, 
respectively (such correction could only have been made by a 
transfusion versus the body rebuilding its own hematocrit and 
hemoglobin). 

Subsequent to service, a September 2001 private treatment record 
indicated the Veteran had been receiving treatment for 
pancytopenia. Also documented was the Veteran's history of 
cirrhosis with ascites. The cirrhosis was attributed to chronic 
hepatitis C virus infection possibly related to the multiple 
blood transfusions the Veteran received for his service injuries. 
The record also indicated the Veteran consumed a "prodigious" 
quantity of alcohol during his life, although this had 
significantly decreased recently. The record also documented 
chronic renal failure, apparently attributable to the 
complications of hypertension. The examiner also noted the March 
2006 private treatment record indicating the Veteran contracted 
hepatitis C as a result of the in-service blood transfusions that 
led to the development of cirrhosis of the liver with subsequent 
hepatorenal syndrome which ultimately resulted in the end-stage 
renal disease that caused the Veteran's death.

The examiner explained that hepatorenal syndrome (HRS) was a 
life-threatening medical condition that consisted of rapid 
deterioration in kidney function in individuals with cirrhosis or 
fulminate liver failure. HRS was usually fatal unless a liver 
transplant was performed; although, treatments, such as dialysis, 
could prevent the advancement of the condition. HRS could also 
affect individuals with cirrhosis regardless of the cause, severe 
alcoholic hepatitis or fulminate hepatic liver failure, and 
usually occurred when liver function deteriorated rapidly because 
of an acute injury such as infection, bleeding in the 
gastrointestinal tract, or overuse of diuretic medications. HRS 
was a relatively common complication of cirrhosis.

The examiner further explained that deteriorating liver function 
was believed to cause changes in the circulation that supplied 
the intestines, altering blood flow and blood vessel tone in the 
kidneys. Renal failure was a consequence of those changes in 
blood flow rather than direct damage to the kidneys.

The examiner determined that the Veteran did have a blood 
transfusion during his period of military service. Subsequently, 
the Veteran was diagnosed with hepatitis C many years after 
discharge, with no treatment or viral load documented in the 
claims file. Additionally, the examiner noted that the Veteran 
was also a heavy drinker over many years and developed cirrhosis 
later in life. There was no indication that the Veteran 
developed any acute or chronic symptoms of hepatitis C during his 
lifetime and no documentation to support that proposition in the 
claims file. Thus, the examiner concluded that it was most 
likely that the Veteran developed cirrhosis due to his heavy 
alcohol consumption, noting that he was also diagnosed with 
chronic renal failure in 1997.

The examiner explained that medical literature indicates that 
hepatic failure contributed or worsened renal failure. In this 
regard, the Veteran's hepatic failure was most likely secondary 
to cirrhosis from heavy alcohol consumption versus hepatitis C. 
Further, the Veteran was diagnosed with chronic renal failure in 
1997 most likely leading to his end stage renal disease at the 
time of death. Thus, the examiner concluded that it was not 
likely that the hepatitis C was a contributing factor in the 
Veteran's death or a cause of his death. To that end, the 
examiner opined that it was most likely that the Veteran's 
alcoholic cirrhosis was the primary factor related to his death.

Based upon review of all the evidence, the Board finds the 
persuasive evidence of record demonstrates a disease or injury 
which caused or contributed to the Veteran's death was not 
incurred in or aggravated by service. The Board is aware that a 
March 2006 private treatment record indicates a relationship 
between the Veteran's in-service injuries and his cause of death, 
explaining that the Veteran sustained a gunshot wound to his 
right lung, which required blood transfusion that led to 
contraction of hepatitis C, which resulted in the development of 
cirrhosis of the liver with subsequent HRS that eventually led to 
end stage renal disease that caused the Veteran's death. To 
that end, the private physician indicated that the Veteran was 
not diabetic nor hypertensive and had no other risk factors for 
development of the renal disease. He made no mention of the 
Veteran's documented long history of alcohol abuse. The 
physician indicated that he had treated the Veteran for several 
years. The Board notes that a treating physician's opinion must 
certainly be considered but is not presumptively afforded greater 
probative weight simply because the physician has regularly 
treated the Veteran. See Winsett v. West, 11 Vet. App. 420, 424-
25 (1998); Guerrieri v. Brown, 4 Vet. App. 467-471-3 (1993). 

In any event, there is no indication that the March 2006 
physician reviewed the claims file in conjunction with reaching 
this conclusion. To that end, certain records, including April 
1996 and September 2001 private treatment records indicate the 
Veteran did in fact have a history of hypertension and documents 
medication the Veteran took to regulate his blood pressure. 
Additionally, the claims file contains a plethora of private 
treatment records indicating the Veteran had a history of 
excessive alcohol use (although the record indicates the Veteran 
quit the excessive drinking in 1965, but continued to drink 
occasionally), another known risk factor in the development of 
the renal disease. The fact that the physician overlooked this 
risk factor when so many other physicians discussed it, lessens 
the credibility of his opinion. Thus, this physician's opinion 
is not adequately explained. A medical opinion based on an 
inaccurate factual premise has no probative value. Reonal v. 
Brown, 5 Vet.App. 4458, 460-61 (1993). A medical opinion or 
examination is adequate where it is based upon consideration of 
the appellant's prior medical history and examinations. Stefl v. 
Nicholson, 21 Vet.App. 120, 123 (2007); Ardison v. Brown, 6 
Vet.App. 405, 407 (1994).

By contrast, in the July 2010 VAMC medical opinion, the examiner 
concluded that it was not likely that the hepatitis C was a 
contributing factor in the Veteran's death or a cause of his 
death; rather, it was most likely that the Veteran's alcoholic 
cirrhosis was the primary factor related to his death. To that 
end, the examiner acknowledged that the Veteran did have a blood 
transfusion during his period of military service and 
subsequently was diagnosed with hepatitis C many years after 
discharge. However, there was no evidence of treatment or viral 
load documentation in the claims file. But, review of the claims 
file indicated the Veteran was a heavy drinker over the early 
years of his life and developed cirrhosis later in life. It was 
the cirrhosis from the heavy alcohol consumption, not from 
hepatitis C, which was the primary factor related to the 
Veteran's death. The physician's opinion was made after a 
thorough review and documentation of all the evidence of record, 
including the March 2006 private treatment record. Thus, the 
Board finds the July 2010 VAMC medical opinion most probative in 
determining that a service-connected disorder did not cause or 
contribute to cause the Veteran's death. See Madden supra.

The Board has also carefully considered the statements offered by 
the appellant and other family members and notes that lay persons 
can attest to factual matters of which they have first-hand 
knowledge. See Washington v. Nicholson, 19 Vet. App. 362, 368 
(2005). The Board finds these statements regarding their 
observations and experiences with the Veteran competent regarding 
what they perceived through their senses. Further, the Board 
does not question that the Veteran gave up excessive drinking 
later in life or that he contracted hepatitis C. However, while 
they may sincerely believe that the Veteran's hepatitis C from 
blood transfusion due to in-service injury contributed to his 
cause of death, they are not licensed medical practitioners and 
are not competent to offer opinions on questions of medical 
causation or diagnosis. Grottveit, 5 Vet. App. 91; Therefore, 
their statements regarding the causation of the Veteran's death 
cannot be considered competent medical evidence.

When all the evidence is assembled VA is then responsible for 
determining whether the evidence supports the claim or is in 
relative equipoise, with the claimant prevailing in either event, 
or whether a preponderance of the evidence is against the claim 
in which case the claim is denied. Gilbert v. Derwinski, 1 Vet. 
App. 49, 55 (1990); Ortiz v. Principi, 274 F. 3d 1361 (Fed. Cir. 
2001). The preponderance of the evidence is against this claim.


ORDER

Entitlement to service connection for the cause of the Veteran's 
death is denied.



____________________________________________
RENÉE M. PELLETIER
Veterans Law Judge, Board of Veterans' Appeals




 Department of Veterans Affairs