**Dolores L. MATTERN, Appellant,**

v.

**Togo D. WEST, Jr., Secretary of Veterans Affairs, Appellee.**

No. 96–1508.

United States Court of Veterans Appeals.

Argued Nov. 19, 1998.

Decided Feb. 23, 1999.

Jacob Geesing, for the appellant.

James L. Calis argued, and John H. Thompson, Acting General Counsel; Ron Garvin, Assistant General Counsel; Carolyn F. Washington, Deputy Assistant General Counsel; and Richard Mayerick were on brief for appellee.

Before KRAMER, FARLEY, and GREENE, Judges.

GREENE, Judge:

The appellant, Dolores Mattern, widow of veteran James Mattern, appeals from the September 26, 1996, Board of Veterans' Appeals (Board) decision that denied her claim for dependency and indemnity compensation (DIC) as not well grounded because she had failed to present evidence establishing that her husband's death was service connected. The appellant has filed a brief, and the Secretary has filed a brief in opposition. This appeal is timely and the Court has jurisdiction of the case pursuant to 38 U.S.C. § 7252(a). For the following reasons, the Court will reverse the Board decision and remand the matter.

## I. FACTS

Mr. Mattern served on active duty in the U.S. Marine Corps from March 1943 to December 1945 and participated in operations in the Asian–Pacific theater (Ryukyu Island, Marianas Islands, and occupational duty in the Qingdao Peninsula in Mainland China) during World War II. R. at 73–76, 82. His service medical records do not reveal any diagnosis of or treatment for liver problems and he was not service connected for any disease or injury. R. at 11–56, 91. In December 1992, he was diagnosed with hepatocellular carcinoma and died from this disease in January 1993. R. at 73, 120–24. He did not have hepatitis or a cirrhotic liver. R. at 120–23. Hepatocellular carcinoma is malignant liver cancer, known also as hepatoma. STEDMAN'S MEDICAL DICTIONARY 224, 28th ed. (1994) [hereinafter STEDMAN'S]. According to

the appellant, during her husband's treatment for his cancer, he was asked by his physicians if he had ever been to China or Southeast Asia. He replied that "the only time in his life he had ever been there was during World War II." R. at 133. She stated that they were told that the cancer was "very strange for the United States, the type of growth they saw, very, very little if any of this type of growth in Lansing, Michigan." *Id.*

The appellant applied for DIC in February 1993, alleging that the cause of her husband's death was service connected. R. at 56–60, 66. In support of her claim, she presented two letters from Dr. Bergman, one of the veteran's private physicians. In a letter, dated February 1993, Dr. Bergman stated:

> The cause of this disease is largely unknown, but there are several well-known risk factors including ... traveling in South East Asia.... To the best of our knowledge the only risk factor [the veteran] had was travel in the service in South East Asia. It is certainly a distinct possibility that [the veteran] could have been exposed to the etiologic factor during his service and only recently did the clinical disease develop.

R. at 66b, 154, 166. In the other letter, dated August 1993, he stated that it was his personal "feeling that [the veteran's] malignancy did originate from his activities in Southeast Asia." R. at 88. After reviewing the claim, VA also requested an opinion regarding the cause of the veteran's death. Based on his review of the veteran's medical records, Dr. Jaszewski, Chief of Gastroenterology at the VA medical center, opined:

> [A]lthough the risk of being exposed to an agent(s) with the potential to cause hepatocellular cancer is increased in persons traveling to or living in southeast Asia, there is no clear evidence in the patients records to indicate that he was exposed to such an agent nor suffered from any condition that would predispose him to later developing hepatocellular cancer.

R. at 79. In an October 1993 rating decision, a VA regional office denied the appellant's claim for DIC, concluding that the cause of the veteran's death was not service connect-ed. R. at 90, 93. She filed an NOD in March 1994 and appealed to the Board in May 1994.

In August 1994, the appellant presented a letter to VA, accompanied by photographs, describing her husband's World War II experiences in the Marine Corps. R. at 118. She explained that the pictures depicted him in the civilian stockade, "in very close proximity to native people." *Id.* She also recounted that he "frequently told tales of working on a railroad on the Qingdao Peninsula where the Marines operated the train, but native labor did the manual work." *Id.* She also considered this to be "close proximity and 'exposure'." *Id.* At a personal hearing, she testified again about her husband's living conditions in China and repeated his reports of his experiences in the Qingdao Peninsula. R. at 131–37. Further, she stated that "he commented many times on the squalor, the filth, the disease, that were very apparent in the ... 'native quarter' that was right next to where they were living." R. at 132. In response to the hearing officer's question about whether her deceased husband ate "steaks and potatoes," she testified, "No, nor were they eating K-rations." R. at 134. She replied that he told her that he ate only local food prepared for him by a native. *Id.*

The appellant also presented additional medical evidence. Another statement by Dr. Bergman, dated April 29, 1994, concluded that the veteran's

> service in Mainland China certainly is relevant-and his service in the Japanese occupied islands is direct exposure to carriers of hepatitis B.... It's quite difficult to prove that the initial exposure was during WWII but it's impossible to prove it wasn't.... Often no specific incident [of exposure] can be demonstrated.

R. at 140–41. Dr. Clarkson, one of the veteran's treating physicians, provided a letter in which he stated that he "totally agreed [with] Dr. Bergman that direct or indirect exposure during [the veteran's] military service was causative." R. at 139. He further opined that exposure to East Asia is "a common variable for many people who have this grave disease," and that "the medical literature is

clearly in support of [the appellant's] claim." *Id.* A statement by Dr. Neiberg, another of the veteran's physicians, explained that "[h]epatocellular carcinoma is an unusual tumor in this part of the world, having much more common representation in tropical climates (Southeast Asia).... [H]epatocellular carcinoma can manifest itself after a long latent period during which it can be totally asymptomatic." R. at 66a, 166, 175. Finally, the appellant presented excerpts from medical journals describing the epidemiology of hepatocellular carcinoma. R. at 143–44, 160. Epidemiology is the study of the prevalence and spread of disease in a community. STEDMAN'S, at 474. It was noted in one treatise that, in the United States and Europe, this form of cancer

> is increasing in incidence but remains relatively uncommon.... In certain other areas of the world, including parts of sub-Saharan Africa, Southeast Asia, Japan ... hepatocellular carcinoma is the most frequent or one of the most frequent malignancies and an important cause of overall mortality.... In most cases hepatocellular carcinoma develops in a cirrhotic liver.... Epidemiologic evidence has also suggested a link between hepatocellular carcinoma and ingestion of aflatoxins, mycotoxins produced by *Aspergillus flavins,* a mold that can grow in warm, moist areas and contaminate peanuts and stored grains.

R. at 143–44. Another excerpt from a medical treatise provided as follows:

> Aflatoxin B$_1$, the mycotoxin of the fungus *Aspergillus flavins,* is a well documented carcinogen in rats, fowl, and fish. [It] grows readily on improperly stored corn, grains, and ground nuts (peanuts). Epidemiologic studies have shown a correlation between the content of aflatoxin in the diet and the incidence of hepatocarcinoma in parts of Africa and Southeast Asia, and such findings strongly support a role for aflatoxins in the high incidence of hepatocarcinoma in these areas.

R. at 160. In September 1996, the Board concluded that the appellant's service-connection claim for the cause of the veteran's death was not well grounded. R. at 6. It determined that the veteran's service medical records failed to present "evidence of an in-service injury or disease to which there could be a nexus with the cause of the veteran's death." *Id.* This appeal followed.

## II. APPLICABLE LAW AND ANALYSIS

 DIC is paid to the surviving spouse, children, or parents of a qualifying veteran who dies from a service-connected disability. *See* 38 U.S.C. § 1310; 38 C.F.R. § 3.5 (1998). For such a death to be considered service connected, it must result from a disability incurred in or aggravated by active service in the line of duty. *See* 38 U.S.C. § 101(16); *Pearlman v. West,* 11 Vet.App. 443, 445 (1998). As with any other claim for service-connected benefits, a claimant seeking DIC has the initial burden of establishing that the claim is well grounded. *See Darby v. Brown,* 10 Vet.App. 243, 245 (1997); *Johnson v. Brown,* 8 Vet.App. 423 (1995); *see also* 38 U.S.C. § 5107(a) ("[A] person who submits a claim for benefits under a law administered by the. Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded"); *Carbino v. Gober,* 10 Vet.App. 507, 509 (1997). Whether a claim is well grounded is a question that the Court reviews de novo under 38 U.S.C. § 7261(a)(1). *See id.; Grivois v. Brown,* 6 Vet.App. 136, 139 (1994); *Grottveit v. Brown,* 5 Vet.App. 91, 92 (1993). A well-grounded claim is defined as "a plausible claim, one which is meritorious on its own or capable of substantiation ... [that] need not be conclusive but only possible." *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990); *accord Black v. Brown,* 10 Vet.App. 279, 283 (1997). Where the determinative issue involves etiology or a medical diagnosis, competent medical evidence that a claim is "plausible" or "possible" is the threshold requirement for the claim to be well grounded. *Heuer v. Brown,* 7 Vet. App. 379, 384 (1995); *Grottveit,* 5 Vet.App. at 93. A well-grounded service-connection claim generally requires (i) medical evidence (diagnosis) of a current disability; (ii) medical or, in some circumstances, lay evidence of incurrence or aggravation of a disease or injury in service; and (iii) medical evidence

of a nexus between the in-service injury and the current disability. *See Caluza v. Brown,* 7 Vet.App. 498, 506 (1995), *aff'd per curiam,* 78 F.3d 604 (Fed.Cir.1996) (table); *see also Epps v. Gober,* 126 F.3d 1464, 1468 (Fed.Cir. 1997) (expressly adopting the definition of a well-grounded claim set forth in *Caluza*). For service connection for the cause of a veteran's death, "the first requirement, evidence of a current disability, will always have been met" (the current disability being the condition that caused death); however, the last two requirements must be supported by evidence. *Carbino,* 10 Vet.App. at 509; *Ruiz v. Gober,* 10 Vet.App. 352, 356 (1997). Evidence submitted to well ground a claim is generally presumed credible. *See Robinette v. Brown,* 8 Vet.App. 69, 75–76 (1995); *King v. Brown,* 5 Vet.App. 19, 21 (1993).

The Secretary argues that the appellant's claim is not well grounded. First, he asserts that the appellant has not pointed to a specific causative factor or disease that the veteran contracted in service, arguing that "mere presence in a region of the world ... is not a causative factor." Secretary's Brief (Br.) at 5. Second, the Secretary argues that there is "no competent medical nexus" evidence because the medical statements of Dr. Bergman and Dr. Clarkson, offered in support of the appellant's claim, fail to provide a causal relationship between the veteran's cancer and service. Secretary's Br. at 4. Although the Secretary purports to be advancing two distinct contentions in support of his argument, they are in reality two sides of the same coin, namely the absence of evidence of a nexus between the veteran's service and his cancer. We disagree.

■ In this case, the appellant's uncontroverted evidence goes farther than to just establish the veteran's "mere presence" in Southeast Asia. She has offered sworn testimony, letters, and pictures that establish that her husband lived and worked amongst the natives and ate the local food. Thus, he was not merely present, but immersed in the local environment. "Service connection connotes many factors but basically it means that the facts, shown by evidence, establish that a particular injury or disease resulting in disability was incurred coincident with ser-

vice." 38 C.F.R. § 3.303(a) (1998). All that is necessary is evidence of a relationship between the current, disabling disease or injury and military service. This relationship need not be conclusive, but only plausible. *See Black* and *Murphy, supra.* Thus, in this case, to well ground her claim, the appellant need only show, through medical evidence, a plausible relationship between her husband's hepatocellular carcinoma and his military service.

The facts that form the predicate for resolving claims for benefits generally are established by the process of induction. Adjudicators and representatives—even judges— are familiar, and thus comfortable with the common situations where statements and records serve as the basis for factual findings, such as service incurrence and current disability. If medical opinions or treatises sufficiently link the facts found, then benefits are awarded. This case, however, presents a different situation in that it calls not for inductive reasoning, but rather for deductive reasoning. Neither § 5107(a) nor the relevant regulations preclude establishment of a well-grounded claim by deduction if warranted by the facts of a particular case. Likewise, they do not preclude a claim from being well grounded on the basis of epidemiology as well as empirical observations.

■ Dr. Bergman opined that it is "a distinct possibility that [the veteran] could have been exposed to the etiological factor during his service." (R. at 66b, 154, 166) and that it was his personal "feeling that [the veteran's] malignancy did originate from his activities in Southeast Asia" (R. at 88). Dr. Clarkson stated that he "totally agreed with Dr. Bergman that direct or indirect exposure during [the veteran's] military service was causative" and that exposure to East Asia is "a common variable for many people who have this grave disease." R. at 139. The Secretary asserts that these medical statements are speculative and conjectural because they fail to identify "the causative factor that they 'guess' the veteran contracted in service that caused the cancer." Secretary's Br. at 5. Contrary to the Secretary's position, however, "use of cautious language does not always express inconclusiveness in a doctor's opinion

on etiology, and such language is not always too speculative for purposes of finding a claim well grounded." *Lee v. Brown,* 10 Vet.App. 336, 339 (1997). An "etiological opinion should be viewed in its full context, and not characterized solely by the medical professional's choice of words." *Id.*

Here, we are presented with a cancer where "often no specific incident [of exposure] can be demonstrated" (R. at 140–41, 143–44, 160), a cancer that can "manifest itself after a long latent period during which it can be totally asymptomatic" (R. at 166, 175), and a rare form of cancer that is statistically more prevalent in Southeast Asia and in people who have traveled in Southeast Asia. In addition, there is ample evidence that the veteran's service in the Marine Corps included living under local conditions in that part of the world. From these facts showing exposure, Dr. Bergman deduced that there is a distinct possibility and that he felt the veteran's carcinoma was contracted during his service tenure in Southeast Asia, with which Dr. Clarkson conclusively concurred.

This Court has reviewed what constitutes acceptable medical opinions for the purpose of establishing well groundedness and finds that our jurisprudence is in accordance. In *Tirpak v. Derwinski,* 2 Vet.App. 609 (1992), a widow sought service connection for the cause of death of her husband, who had died from a heart attack. He had suffered deformities of the tongue and jaw as a result of service-connected injuries, and these deformities had prevented paramedics and the treating physician at the hospital from intubating him. The medical evidence suggesting that failure to intubate him had caused his death consisted solely of a statement from the treating physician that "if intubation had been successful, [the veteran] may or may not have survived the cardiac arrest." *Id.* at 610. The Court, however, held that the physician's statement, expressed as "may or may not," was "speculative" and, thus, insufficient to well ground the appellant's claim. *Id.* at 611.

In *Lathan v. Brown,* 7 Vet.App. 359 (1995), the appellant sought to prove service connection for a heart disease, diagnosed as cardiomyopathy. The medical evidence of record consisted of four statements from treating physicians. One opined that "one can in no way rule out" a relationship between the veteran's current heart condition and his in-service injury. *Id.* at 363–64. Another physician stated that "[s]ince the etiology of congestive cardiomyopathy is unknown in the vast majority of cases," a relationship between the veteran's heart condition and service-connected injuries "cannot be totally excluded." *Id.* A third medical opinion explained that "the possibility at least exists that the cardiomyopathy may have been the result of persistent cardiac insults occurring at the time of his many surgeries." *Id.* Finally, a treating physician opined that the veteran's "cardiac condition could be secondary to his shrapnel injury." *Id.* In determining that the appellant's claim was well grounded, the Court distinguished *Tirpak,* finding that medical opinions suggesting that a causal connection was possible, although less than probable, could well ground a claim. The Court held that *Tirpak* did not require that medical opinions be expressed in terms of certainty. *Id.* at 366. Indeed, the medical statement to the effect that medical science could not "rule out" an association between that cardiomyopathy and the veteran's service-connected chest trauma was sufficient to constitute plausible medical nexus evidence. *Id.*

Subsequent to *Lathan,* this Court decided *Watai v. Brown,* 9 Vet.App. 441 (1996). There, the appellant filed a service-connection claim for a kidney condition, later diagnosed as glomerulonephritis. In support of his claim, he submitted a letter from his physician stating, "[I]f I had to make a guess, I would guess that there very well might have been a relationship between his hematuria in [service] and his present kidney problems." *Id.* at 442. Another treating physician wrote: "One of the early symptoms of chronic glomerulonephritis is hematuria," and "when the appellant was younger, apparently he had gross hematuria which was probably due to his underlying chronic glomerulonephritis." *Id.* The Board concluded that the physician's statements were "speculative at best concerning relationship to ser-

228

vice" and denied the claim. *Id.* at 443–44. The Court, however, held that "[t]hese statements, while not necessarily conclusive, are competent evidence that the claim is plausible." *Id.* at 443.

In *Molloy v. Brown,* 9 Vet.App. 513 (1996), the appellant, seeking service-connected disability benefits for a back condition, offered two statements from treating physicians in support of his claim. The first statement reported that "it is possible that the original injury in [service] predisposed him to earlier osteoarthritis." *Id.* at 515. The second statement explained that the appellant's in-service injury "could be a contributing factor to his present symptomatology." *Id.* On appeal to the Court, the Secretary argued that the physician's opinion stated as "could," was speculative and, thus, not well grounded. The Court, however, concluded that the use of the word "could" did not render the physician's opinion without any probative value and was enough to make the claim plausible. *Id.* at 516.

Recently, the Court revisited physicians' opinions stated as "could" in *Bloom v. West,* 12 Vet.App. 185 (1999). Recognizing "the almost infinite number of fact situations that can arise" in determining well groundedness, the Court found that, in the facts of that case, a medical opinion that the cause of the veteran's death "could" have been attributed to his time in a POW camp, "without supporting clinical data or other rationale," was insufficient to well ground the claim. *Id.,* 12 Vet.App. at 187.

█ Additionally, this Court has addressed the relevance of medical treatise evidence to the determination of well groundedness. Generally, an attempt to establish a medical nexus to a disease or injury solely by generic information in a medical journal or treatise "is too general and inconclusive" to well ground a claim. *Sacks v. West,* 11 Vet. App. 314, 317 (1998) (citing *Beausoleil v. Brown,* 8 Vet.App. 459, 463 (1996)); *see Libertine v. Brown,* 9 Vet.App. 521, 523 (1996) (holding that medical treatise evidence proffered by the appellant in connection with his lay testimony was insufficient to satisfy requirement of medical · evidence of nexus to

well-ground claim). Medical treatise evidence, however, can provide important support when combined with an opinion of a medical professional. *See Rucker v. Brown,* 10 Vet.App. 67, 73–74 (1997) (holding that evidence from scientific journal combined with doctor's statements was "adequate to meet the threshold test of plausibility"); *Bielby v. Brown,* 7 Vet.App. 260, 265–67 (1994). Similarly, medical treatise evidence could "discuss[ ] generic relationships with a degree of certainty such that, under the facts of a specific case, there is at least a plausible causality based upon objective facts." *Wallin v. West,* 11 Vet.App. 509, 514 (1998) (citing *Sacks, supra).* Indeed, as stated in *Wallin,* "in order for a claim to be well grounded [it] need not be supported by evidence sufficient for the claim to be granted. Rather, the law establishes only a *preliminary* threshold of plausibility with enough of an evidentiary basis to show that the claim is capable of substantiation." *Id.* (citing *Robinette,* 8 Vet.App. at 76).

█ Thus, this case is consistent with our case law defining what constitutes sufficient medical evidence to make a claim well grounded. Dr. Bergman's and Dr. Clarkson's statements employ the same, less-than-conclusive language held to support a plausible claim. Dr. Bergman stated that "often no specific incident [of exposure] can be demonstrated" and that it was impossible to prove that the veteran's initial exposure to the carcinoma was not during his service, in other words, saying that it could not be ruled out. *See Lathan, supra.* He also stated that it was "a distinct *possibility* that [the veteran] *could* have been exposed to the etiologic factor during service" (emphasis added). *See Molloy and Watai, supra.* Both Dr. Bergman and Dr. Clarkson conclusively state that the veteran's travel and habitation in Southeast Asia during his service caused his fatal cancer. Moreover, these medical opinions are combined with medical journal articles that discuss a plausible epidemiological connection between the veteran's service and cause of death. Therefore, based upon these facts, *cf. Bloom, supra,* there is ample support for deducing a nexus between the veteran's type of cancer and his exposure to cer-

tain conditions rendering him susceptible to that cancer. The Secretary's characterization of these medical opinions as guesswork (*see* Secretary's Br. at 5) misapprehends both the substance of our law and the statements themselves. *See Watai, supra* (holding that a physician's opinion as to nexus to service expressed as "I would *guess* that there very well might have been," although not conclusive, suffices to well-ground a claim (emphasis added)). Any failure of the physicians to provide a basis for their opinions "goes to the weight or credibility of the evidence in the adjudication on the merits rather than the threshold determination of well groundedness, a stage at which the claimant's evidence is presumed credible." *Hernandez–Toyens,* 11 Vet.App. at 382; *see Robinette,* 8 Vet.App. at 76 (1995).

 Consequently, the evidence of record, presumed credible, raises a reasonable and plausible connection between the veteran's fatal hepatocellular carcinoma and his residence and travel in Southeast Asia during service. Accordingly, the Court holds, upon de novo review, that the appellant has submitted a well-grounded claim.

As an alternate position, the Secretary argues that if the appellant's claim is determined to be well grounded, "the Court should find that the Board rendered a de facto merits decision that should be affirmed under the clearly erroneous standard of review." Secretary's Br. at 7. This Court declines that offer. Because the claim is well grounded, the Secretary's duty to assist remains unfulfilled. In that regard, it is noted that at the time that Dr. Jaszewski, the VA physician, rendered his opinion concerning a medical nexus, he found that there was no clear evidence in the record to indicate that the veteran was exposed to an agent or condition that would predispose him to later developing hepatocellular carcinoma. The veteran's living conditions in Southeast Asia were subsequently made available, but never provided to Dr. Jaszewski for review. Such a referral would have been appropriate and consistent with developing the claim, and is necessary for its adjudication. Without it, the current reasons or bases are inadequate to facilitate judicial review. *See Gilbert v. Derwinski,* 1 Vet.App. 49, 57 (1990).

On remand, "the appellant will be free to submit additional evidence and argument" on the remanded claim. *Quarles v. Derwinski,* 3 Vet.App. 129, 141 (1992). Any subsequent Board decision shall provide an adequate statement of reasons or bases, *see* 38 U.S.C. § 7104(d)(1), consistent with law, regulation, and this opinion and in accordance with § 302 of the Veterans' Benefits Improvement Act, Pub.L. No. 103–446, 108 Stat. 4658 (1994) (requiring the Secretary to provide for expeditious treatment of remanded claims). *See Allday v. Brown,* 7 Vet.App. 517, 534 (1995). The Court notes that "a remand by this Court or the Board confers on the [appellant], as a matter of law, the right to compliance with the remand orders .... [and] imposes upon the Secretary ... a concomitant duty to ensure compliance with the terms of the remand." *Stegall v. West,* 11 Vet.App. 268, 271 (1998).

## III. CONCLUSION

Upon consideration of the record on appeal and the pleadings and oral arguments of the parties, the September 26, 1996, Board decision is REVERSED and the matter is REMANDED for further development and readjudication consistent with this opinion and in accordance with all other applicable law and regulation. *See* 38 U.S.C. §§ 1110, 5107(a), (b), 7104(a), (d)(1).