http://www.va.gov/vetapp16/Files3/1621752.txt

Citation Nr: 1621752 
Decision Date: 05/31/16 Archive Date: 06/08/16

DOCKET NO. 10-17 623 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Jackson, Mississippi

THE ISSUE

Entitlement to service connection for the cause of the Veteran's death. 

WITNESSES AT HEARING ON APPEAL

The appellant and her daughter

ATTORNEY FOR THE BOARD

C. Fields, Counsel

INTRODUCTION

The Veteran served on active duty in the U.S. Air Force from May 1960 to March 1981; he died in February 2008. The appellant is the Veteran's surviving spouse. 

This matter initially came before the Board of Veterans' Appeals (Board) on appeal from a June 2009 rating decision of a Department of Veterans Affairs (VA) Regional Office (RO). The appellant testified at a formal RO hearing before a Decision Review Officer (DRO) in February 2011, and at a Board hearing at the RO in March 2012. A transcript of each hearing is associated with the claims file.

In March 2013, the Board denied the appellant's claim. She appealed to the U.S. Court of Appeals for Veterans Claims (Court). In a June 2014 Order, pursuant to a Joint Motion for Remand, the Court vacated and remanded the Board's decision.

The Court, via the Joint Motion, found that the appellant had not waived Agency of Original Jurisdiction (AOJ) review of additional evidence submitted in March 2012, contrary to the Board's prior finding. Moreover, the appellant submitted additional evidence in September 2014, along with a statement specifically indicating that she was not waiving AOJ review and requesting that the case be remanded. See 38 C.F.R. § 20.1304 (2015). Accordingly, the Board remanded this case in December 2014. The AOJ considered the additional evidence in a January 2015 supplemental statement of the case. Thus, the remand directives were satisfied. 
 

FINDINGS OF FACTS

1. The Veteran died in February 2008; the certificate of death listed the immediate cause of death as chronic obstructive pulmonary disease (COPD), with no other conditions listed as significant contributing factors in his death. 

2. The Veteran was in receipt of VA compensation benefits for service-connected disabilities of the ankle/calf, eye, and hemorrhoids at the time of his death; these disabilities did not cause or contribute to cause his death. 

3. The Veteran is presumed to have been exposed to herbicides during service in Vietnam, but his COPD was not subject to presumptive service connection based on such exposure, and he did not have lung cancer or any other condition eligible for presumptive service connection that caused or contributed to his death.

4. The Veteran's immediate cause of death of COPD was not incurred as a result of his service or any incidents therein, to include exposure to chemical dioxins, asbestos, or hazardous materials; and the evidence does not establish any other disability related to service that materially contributed to cause his death.

CONCLUSION OF LAW

The criteria for entitlement to service connection for the cause of the Veteran's death have not been met. 38 U.S.C.A. §§ 1110, 1116, 1131, 1137, 1310, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304, 3.307, 3.309, 3.312 (2015). 

REASONS AND BASES FOR FINDINGS AND CONCLUSION

I. VA's Duties to Notify and Assist

The AOJ notified the appellant, to include in a May 2008 letter and in decisional documents, of the evidence and information necessary to establish entitlement to service connection for the cause of the Veteran's death, as well as the responsibilities of VA and the appellant in obtaining or providing such evidence. The appellant was notified of the disabilities for which the Veteran was service-connected at the time of death, as well as how to establish all elements of a service connection claim for other disabilities. See Hupp v. Nicholson, 21 Vet. App. 342, 352-53 (2007). To the extent that any notices were provided after the initial adverse rating action in June 2009, the claim was subsequently readjudicated in a January 2015 supplemental statement of the case, thereby curing any such notice deficiency.

In addition, during the RO and Board hearings, the DRO and Veterans Law Judge, respectively, noted the basis of the prior determination and the elements that were lacking to substantiate the claim for benefits. They sought to identify any pertinent evidence not currently associated with the claims folder that might have been overlooked or was outstanding that might substantiate the claim. The hearings focused on the elements necessary to substantiate the claim, and the appellant demonstrated through her testimony that she had actual knowledge of the requirements. The appellant described some of the symptoms, manifestations, and treatment produced and received by her husband prior to his death; and she testified as to why she believed there was a link between the Veteran's service and the disability that caused his death. Moreover, the appellant has not asserted that VA failed to comply with 38 C.F.R. 3.103(c)(2), or identified any prejudice in the conduct of the Board hearing. See Bryant v. Shinseki, 23 Vet. App. 488 (2010).

VA also provided all required assistance to the appellant, and there is no argument or indication of any additional evidence necessary in order to fairly decide this appeal. In particular, the Veteran's service treatment and personnel records, as well as post-service identified records since 1981, including terminal treatment records and records from the Social Security Administration (SSA), were obtained. 

VA obtained two medical opinions; one from a VA examiner in March 2010, and another from a pulmonary specialist with the Veterans Health Administration (VHA) in December 2012. The appellant was provided an opportunity to review and respond to these opinions, and she submitted arguments and evidence, including various internet articles during the appeal, as well as an additional medical opinion in September 2014. No additional facts were provided after December 2012, and no additional medical opinion is needed.

The appellant has asserted that a biopsy or autopsy was necessary to determine whether the Veteran had lung cancer (which would be eligible for presumptive service connection) that caused his death, based on notations that a malignancy should be considered for a lung nodule seen on studies in 2003. See, e.g., January 2012 letter. The appellant has no medical expertise, and no medical expert has stated that an autopsy would be necessary to provide an opinion. Instead, a pulmonary physician noted in a 2012 report that it was "highly unlikely" that the Veteran had lung cancer at the time of his death in 2008, based on the 2003 reports and subsequent evidence concerning the Veteran's lungs, which included multiple additional chest X-rays and CT scans. Cf. Daves v. Nicholson, 21 Vet. App. 46 (2007) (finding that the Board must explain why obtaining an autopsy report or, at the very least, informing the appellant that an autopsy report was not necessary, where a VA medical examiner had stated he could not make a decision without an autopsy report). Thus, an autopsy is not necessary in this case, as there is no reasonable likelihood that it would help substantiate the appellant's claim. 

In sum, VA satisfied its duties to notify and assist, and there is no indication that any possible defect reasonably affected the outcome of this case. A further remand would only result in additional delay with no likely benefit to the appellant. Thus, the appellant will not be prejudiced by a decision on the merits at this time.

II. Analysis of Merits

A surviving spouse of a qualifying Veteran who died as a result of a service-connected disability is entitled to receive dependency and indemnity compensation (DIC). To warrant service connection for the cause of the Veteran's death, the evidence must show that a service-connected disability was either a principal or a contributory cause of death. 38 U.S.C.A. § 1310; 38 C.F.R. § 3.312. 

A disability will be considered the principal (primary) cause of death when such disability, singly or jointly with some other condition, was the immediate or underlying cause of death or was etiologically related thereto. 38 C.F.R. § 3.312(b).

A disability will be considered a contributory cause of death when it contributed substantially or materially to death, combined to cause death, or aided or lent assistance to the production of death. It is not sufficient to show a condition causally shared in producing death; rather, it must be shown that there was a causal connection to the Veteran's death. 38 C.F.R. § 3.312(c)(1).

Service-connected diseases or injuries involving active processes affecting vital organs should receive careful consideration as a contributory cause of death, the primary cause being unrelated, from the viewpoint of whether there were resulting debilitating effects and general impairment of health to an extent that would render the person materially less capable of resisting the effects of other disease or injury primarily causing death. 38 C.F.R. § 3.312(c)(3). 

There are primary causes of death which by their very nature are so overwhelming that eventual death can be anticipated irrespective of coexisting conditions; however, there may be a reasonable basis for holding that a service-connected condition was of such severity as to have a material influence in accelerating death. In such situations, it would not generally be reasonable to hold that a service-connected condition accelerated death unless such condition affected a vital organ and was of itself of a progressive or debilitating nature. 38 C.F.R. § 3.312(c)(4). 

Service connection for the cause of death is determined in accordance with the statutes referable to establishing service connection for compensation purposes under Chapter 11 of 38 U.S.C.A. (§ 1101 et. seq.). 38 U.S.C.A. § 1310(a).

Service connection will be granted for a disability resulting from disease or injury that was incurred or aggravated in the line of duty during active service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303(a). Where a disease is first diagnosed after service, direct service connection will be granted when all of the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). Presumptive service connection may be granted under certain circumstances, which are discussed below as pertinent. 

A determination that presumptive service connection is not warranted for a disease does not preclude VA from granting service connection if there is evidence of a direct causal link to service. Combee v. Brown, 34 F.3d 1039 (Fed. Cir. 1994).

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, all reasonable doubt will be resolved in favor of the claimant. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102.

The Veteran died in February 2008. The evidence establishes that the appellant is his surviving spouse, and she filed a timely claim for DIC benefits in April 2008.

The Veteran's certificate of death listed the immediate cause of death as COPD. No other significant contributing conditions were listed. There was no autopsy.

At the time of his death in 2008, the Veteran had been granted service connection for a neuroma excision of the left ankle/calf, an eye disability, and hemorrhoids, with a 10 percent combined disability evaluation. There is no argument or indication that such disabilities caused or contributed to cause the Veteran's death.

Instead, the appellant contends that the Veteran's diagnosed COPD, which ultimately led to his death, was the result of his repeatedly being exposed to asbestos, hazardous or environmental chemicals (such as fuel), and/or chemical dioxins (Agent Orange), through his service duties as an aircraft mechanic, technician, and repairman. The appellant further asserts that the Veteran had lung cancer as a result of service that led to his death. See, e.g., 2012 hearing transcript.

The Board does not doubt the appellant's sincerity in her belief that the Veteran's death, due to COPD or otherwise, was related to his military service. Nevertheless, the matter at hand involves medical assessments that require medical expertise because respiratory disorders, to include COPD or cancer, are complex in and of themselves, and the Veteran had a complex medical history with multiple possible factors to result in COPD or other respiratory disorder. There is no indication that the appellant has any medical expertise; thus, she is not competent to provide an opinion regarding the cause of the Veteran's death or the etiology of his COPD. See Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007).

The appellant submitted several articles from the internet concerning COPD, asbestos, chemical dioxins (such as Agent Orange), and other hazardous materials related to aviation duties, including but not limited to beryllium, hydraulic fluid, cleaning solvents, and aviation fuels. A medical article or treatise "can provide important support when combined with an opinion of a medical professional" if it discusses generic relationships with a degree of certainty such that, under the facts of a specific case, there is at least "plausible causality" based upon objective facts. Mattern v. West, 12 Vet. App. 222, 228 (1999); see also Sacks v. West, 11 Vet.App. 314, 317 (1998) (noting that general and inconclusive information is likely to make a causal connection seem plausible based on the "instinctive inference of a layperson," as opposed to the trained opinion of a medical professional). 

These internet articles have low probative value and are not sufficient to establish entitlement to service connection for the cause of the Veteran's death. There are several VA and private medical opinions, which are discussed below. The VA medical opinions reflect a review of the entire claims file and pertinent medical literature, and they are generally consistent with the information in these articles. 

The Board will first address the theory of presumptive service connection due to Agent Orange exposure. The Veteran served on active duty in the Republic of Vietnam from May 1969 to February 1970. See, e.g., DD Form 214, record of military assignments. Thus, he is presumed to have been exposed to herbicides (including Agent Orange) during such service. 38 C.F.R. §§ 3.307(a)(6). 

Certain listed diseases, including respiratory cancer (cancers of the lung, bronchus, larynx, or trachea), will be presumed service-connected due to herbicide exposure during service, even if there is no record of such disease during service, if the condition manifested to a compensable degree at any time. 38 C.F.R. § 3.309(e). 

Service connection may not be granted on a presumptive basis as due to herbicide exposure for any condition for which VA's Secretary has not specifically determined that a presumption of service connection is warranted. See, e.g., 68 Fed. Reg. 27630 (May 20, 2003); see also 38 U.S.C.A. § 1116(b),(c). Moreover, VA's Secretary has repeatedly determined, based on reports of the National Academy of Sciences (NAS), that there is insufficient evidence to determine whether an association exists between herbicide exposure and other respiratory disorders, to include COPD. See, e.g., 79 Fed. Reg. 20308, 20312 (April 11, 2014). 

As such, presumptive service connection is not authorized for the Veteran's COPD based on herbicide exposure, which was identified as his immediate cause of death. 

Furthermore, the preponderance of the evidence establishes that the Veteran did not have lung cancer, or that such a condition caused or contributed to his death. 

Post-service treatment records reflect a diagnosis of COPD/emphysema in the 1990s. In April 1987 and February 1994, chest X-rays were within normal limits. In June 1997, X-rays were conducted for shortness of breath, and the impression was lingular atelectasis, with no other evidence for focal pulmonary parenchymal consolidation. Also in June 1997, PFTs showed severe airflow obstruction and other impairment. Chest X-rays in February 1998 and December 1998 noted a history of COPD, now with a chronic cough, but the lungs were normal. Thereafter, multiple chest X-rays from January 1999 through November 2002 showed hyperexpansion of the lungs, which was noted to be consistent with COPD. Further, in July 2002, the Veteran denied a history of chronic bronchitis symptoms, and the diagnosis was severe emphysema. In an October 2002 SSA evaluation, the Veteran reported being diagnosed with emphysema two years earlier, and he complained of dyspnea on exertion and shortness of breath for the past six years that had been worsening. This is relatively consistent with the treatment records.

Treatment records from July to October 2003, including X-rays and CT scan of the chest, indicated that PFTs were consistent with a severe obstructive lung disease and pulmonary emphysema, and that a new small nodular density was seen on the left upper lobe, which was not seen on a prior X-ray in November 2002. A repeat CT scan in six months was recommended. In October 2003, a physician stated that "malignancy should be a consideration," and "smoking is really his main disorder." 

Repeated chest X-rays, noting a history of COPD, were conducted in November 2003, December 2003, September 2004, November 2004, and April 2005. One of multiple chest X-rays in November 2003 noted minimal improvement from another X-ray the previous day, with improved lung volumes and resolution of mild interstitial pulmonary edema. The December 2003 study noted that there was a new posteromedial right lower lung infiltrate; and the April 2004 study noted that this prior infiltrate had resolved. The September 2004 X-ray noted nodular densities overlying the mid-left lung, which may have been secondary to pleural thickening or parenchymal nodules, but were stable. The November 2004 and April 2005 studies also noted stable emphysematous changes, and the 2005 X-ray noted progressive air-space disease but no other acute interval change since 2004. 

Treatment records in April 2005 again diagnosed severe COPD, and the provider noted that the Veteran's continued tobacco use was causing damage to his lungs. Indeed, this provider stated that he had again emphasized that the Veteran needed to quit smoking and that "if he keeps doing so [he] will die soon." A June 2005 repeat CT of the chest found stable centrilobular emphysematous changes of the lungs as compared to the September 2003 CT scan. Otherwise, there was a new, indeterminate 5-mm nodular opacity in the right upper lobe that was not previously seen; the previously seen 5-mm nodule in the left upper lobe was not demonstrated in 2005; and there was scarring and a suggestion of minimal effusion. A 6-month follow-up exam was recommended to ensure stability of these findings. 

Shortly before the Veteran's death, in February 2008, a chest X-ray for COPD exacerbation again resulted in a finding that there was evidence of COPD. A soft tissue density adjacent to the left lingular, also characterized as an infiltration or atelectasis, was noted to have resolved or decreased as compared to an X-ray a few days earlier. A soft tissue density adjacent to the left hilum had increased slightly in size, which was noted to probably represent partial atelectasis in the left upper lobe. "Atelectasis" is defined as incomplete expansion, airlessness, or collapse of a lung or portion of a lung. Dorland's Illustrated Medical Dictionary 173 (31st ed. 2007). 

Additionally, in a March 2010 report based upon review of the claims file, a VA examiner opined that the Veteran "did not have any lung cancer." This examiner stated that the "'spot' was a benign lesion," and that it "would have been asymptomatic and of no clinical significance." Based on this reasoning, this VA examiner opined that this lesion was not related to the Veteran's death. 

Similarly, in a December 2012 report, a VHA pulmonary physician opined that it was "unlikely" that the Veteran had lung cancer, or that it contributed substantially or materially to his death. This specialist discussed the evidence, stating:

A solitary pulmonary nodule is a spherical mass within the lung. A size of 3.5 cm (35 mm) or larger suggests malignancy. A CT scan obtained on September 12, 2003[,] demonstrated a 5 mm nodule in the left upper lobe of the lung. The Veteran saw Dr. [G.T.] for evaluation, and because of the Veteran's smoking history, it was advised he have a follow up CXR [chest X-ray] in 3 months, and a CT scan in 6 months. A CXR was performed in November of 2003, and again on November 24, 2004[,] which did not mention the presence of any nodule in that area. Therefore, the nodule did not appear to grow significantly in the 14 months following initial identification and more likely represented a benign process. While only a biopsy can diagnose a lung cancer with certainty, given the lack of growth in the nodule over that period of time and it's [sic] small size, it is highly unlikely [the Veteran] suffered from lung cancer that contributed to his death. 

Although the appellant submitted a September 2014 letter from Dr. B, a medical director of a hospice company, he also did not indicate that the Veteran had lung cancer. Instead, Dr. B referred only to his "early demise from lung disease." 

Moreover, as summarized above, no diagnosis of lung cancer was recorded in 2003 at any point prior to the Veteran's death in February 2008, despite the notation that a malignancy should be considered in 2003, and despite multiple repeated X-rays and CT scans of the chest, including in February 2008. There was also no subsequent reference to a suspected malignancy; instead, providers noted COPD. 

Accordingly, lung cancer (as opposed to COPD) is not shown to have existed during the Veteran's lifetime, and presumptive service connection for the cause of his death is not warranted on this basis. See 38 C.F.R. §§ 3.307, 3.309.

The appellant has also asserted that the Veteran had chloracne and Type II diabetes mellitus, which could have been eligible for presumptive service connection based on Agent Orange exposure in Vietnam. See id.; see also, e.g., March 2009 statement and 2011 hearing transcript. The Veteran's service treatment records, such as in February 1966, indicate that he had ongoing severe acne prior to his service in Vietnam. More importantly, there is no argument or indication that any chloracne, which is a skin condition, caused or contributed to the Veteran's death, to include by rendering him less capable of resisting the effects of his fatal COPD. There was also no diagnosis of diabetes mellitus, as opposed to high glucose or blood sugar at times; and there is no competent medical evidence to suggest that this was a contributory cause of the Veteran's death. See 38 C.F.R. § 3.312(c). Again, the appellant is not competent to provide a diagnosis of diabetes mellitus, or to offer an opinion as to whether any such disorder was related to the Veteran's death, because she has no medical expertise and these are beyond lay observation.

Turning to the raised theories for direct, non-presumptive service connection, the Veteran's service records confirm that he served as an aircraft technician, mechanic, and pneudraulic repairman. See, e.g., DD Form 214, record of military assignments. Duties in these assignments would be consistent with exposure to hydraulic fluid, fuel, and other chemicals that may be toxic to the lungs. Indeed, treatment records in September 1972 noted that he was exposed to potentially toxic chemicals including hydraulic fluid and a cleaning solvent on a daily basis indoors.

There is no specific statutory or regulatory guidance with regard to claims based on alleged asbestos exposure; however, the relevant factors discussed in VA's adjudication manual (the M21-1) must be considered and addressed by the Board in assessing the evidence in an asbestos-related claim. See VAOPGCPREC 4-2000.

VA's adjudication manual discusses the definition of asbestos, general effects of asbestos exposure, prevalence of specific diseases resulting from exposure to asbestos, occupational exposure to asbestos, the latent period for development of disease due to exposure to asbestos, diagnostic indicators of asbestosis. In considering service connection for disabilities claimed as a result of in-service asbestos exposure, VA should determine whether or not service records demonstrate asbestos exposure during service; conduct development to determine whether there was exposure to asbestos before or after service; and determine whether a relationship exists between the claimed disability and asbestos exposure, keeping in mind latency and exposure factors. See generally M21-1 IV.ii.2.C.2. 

In this case, there is no argument of pre-service exposure to asbestos or other chemicals that are potentially toxic to the lungs, but there was possible exposure after service because the Veteran worked as a diesel mechanic, among other positions. Further, the VA manual acknowledges that one of the major occupations involving exposure to asbestos includes the "manufacture and servicing of friction products, such as clutch facings and brake linings." M21-1 IV.ii.2.C.2.d. Similarly, military occupational specialties with "probable" exposure to asbestos include aviation machinist's mate (jet engine mechanic), aviation structural mechanic (hydraulics), and aviation support equipment technician. M21-1 IV.ii.1.I.3.c. Thus, resolving doubt in the appellant's favor, in-service asbestos exposure is shown.

There were no complaints, findings, or diagnoses of COPD or emphysema in the Veteran's service treatment records. In addition to his likely exposure to asbestos and other potentially hazardous chemicals during service, however, the Veteran was treated for upper respiratory infections, pneumonia, viral pneumonitis, pharyngitis, and bronchitis. See, e.g., records in March 1965, December 1966, July 1971, January 1972, March 1976, and November 1977. In September 1972, the Veteran reported chronic cough and shortness of breath, stating that he was having recurrent unexplained episodes of shortness of breath associated with blurry vision, and chronic cough mostly at night or in the early morning with heavy phlegm. Examination was normal at that time. An April 1978 periodic examination was clinically normal, a chest X-ray was within normal limits, and there were no noted respiratory problems or symptoms. A few months before retirement, an October 1980 summary before an unrelated surgical procedure noted that the Veteran did not have asthma, pneumonia, or bronchitis. At his February 1981 retirement examination, the Veteran reported smoking one pack of cigarettes per day, and a pulmonary function test (PFT) noted "mild airflow obstruction." The clinical examination noted mild obstruction, but found the lungs and chest to be clinically normal. In his Report of Medical History for retirement, the Veteran denied having chronic cough, asthma, shortness of breath, pain or pressure in the chest. The Veteran was discharged from service in March 1981. Shortly thereafter, in August 1981, a PFT was normal. The Veteran continued to smoke tobacco products.

Although VA's adjudication manual describes certain diseases and diagnostic procedures for potentially asbestos-related conditions, this information must be considered together with medical interpretation of the particular facts in each case.

The appellant does not argue that the Veteran had persistent breathing problems or any pulmonary diagnosis since service, and the evidence does not establish any such chronology. Instead, as discussed above, post-service medical records reflect a diagnosis of COPD/emphysema, shown by chest X-rays as of the late 1990s, but normal prior X-rays, such as in 1987 and 1994. Similarly, the Veteran denied any chronic bronchitis symptoms for treatment in July 2002, and he reported breathing problems for the past six years in an October 2002 evaluation for his SSA claim. 

Again, although there were notations of lung nodules or infiltration at times, such as in CT scans in 2003 and 2004, no diagnosis of lung cancer was recorded in the Veteran's treatment records prior to his death, despite multiple repeated diagnostic tests. There was also no diagnosis of asbestosis or other asbestos-related disease.

In a March 2010 opinion, based on review of the claims file, a VA physician opined that the Veteran died as a result of COPD, and that this condition was "less likely than not caused by or related to service." This examiner reasoned that the normal PFT result shortly after service in August 1981 indicated that he did not have COPD during service, and that the "spurious borderline result" of the PFT during service in February 1981 was not relevant because the Veteran "developed COPD years later after continuing to smoke cigarettes and cigars." The examiner further stated that acute bronchitis, for which the Veteran was treated during service, was "consistent with natural exposure and does not cause emphysema (COPD)." The examiner explained that the "preponderance of medical evidence and sound medical reasoning holds that COPD (emphysema) is more likely than not caused by or related to smoking use primarily and/or secondarily." She further stated that "[a]sbestos, agent orange and hydraulic fluid have not been found to represent significant proximate causes of emphysema (COPD)." Thus, the examiner concluded that the Veteran's COPD was "less likely than not caused by, related to or worsened by" any incident or exposures during his military service.

Additionally, in a December 2012 report, a VHA pulmonary physician opined that it was "unlikely" that the Veteran's COPD that caused his death was related to his military service. This specialist reasoned that PFT results were "normal" at military retirement in 1981. This specialist further reasoned, "Any exposures to hydraulic fluid, jet fumes or fuel, episodes of bronchitis, pneumonia, or pneumonitis that occurred during [the Veteran's] time as an aircraft maintenance specialist and caused alleged COPD would have manifested at the time of the PFT performed when he retired from the military." Any exposures the Veteran had during service presumably ceased when he retired, and the specialist stated that those exposures did not lead to any deficits in his pulmonary functions based on the PFT results. 

The VHA pulmonary physician also provided detailed information regarding the possible effects of exposure to beryllium and application to this case, stating: 

Beryllium is known to cause both acute and chronic pulmonary disorders. The acute disorder is usually an acute inflammatory condition in the upper airways, bronchiolitis, pulmonary edema, and chemical pneumonitis. Symptoms usually include acute onset of cough, chest pain, bloody sputum, rales and cyanosis on exam, and CXR [chest X-ray] findings of patchy air-space disease. It usually resolves with removal from the exposure. Chronic beryllium disease is a multisystem disorder characterized by granulomas throughout the body and primarily in the lung. Symptoms usually include insidious onset of cough, chest pain, weight loss, fatigue, arthralgias, and crackles on exam. CXR usually demonstrates ill-defined nodular opacities with hilar adenopathy. PFT patterns for patients with chronic beryllium disease are as follows: Restrictive defect (20%), normal spirometry and lung volumes with reduced DLCO (36%), obstructive defect (39%), and no abnormality (5%). While the Veteran demonstrated an obstructive defect on PFT's obtained years after [service] retirement, there was no evidence by exam or CXR that he had other manifestations of chronic beryllium disease. 

The VHA specialist continued to explain the possible effects and diagnostic procedures related to the Veteran's possible hazardous exposures, including to hydraulic fluids and asbestos, during service. The specialist stated:

Hydraulic fluids can contain organophosphates, and generally cause a syndrome consistent with organophosphate poisoning, which is a neurologic crisis consisting of cramps, excessive secretions, diarrhea, bronchoconstriction, weakness, confusion, and coma among other symptoms. It occurs immediately after exposure, and there is no reported chronic condition that appears years after removal from the exposure.

Asbestos can cause a multitude of manifestations of the pulmonary system, from benign pleural effusions and pleural plaques to asbestosis and mesothelioma. In general, it is a fibrotic lung disorder that can manifest 20-40 years after exposure. It has typical radiographic features and usually demonstrates a restrictive defect of pulmonary function testing. The Veteran did not demonstrate any of these features of PFT or CXR, so it is very unlikely that he suffered from any effects related to asbestos exposure.

The pulmonary response to occupational fumes and gases depends on the chemical nature of the exposure, the site of deposition, contact with the bronchial tree, and host response factors such as smoking. From evidence found in multiple epidemiologic studies involving exposure to gases, dusts, and fumes, it has been found that smokers with occupational exposures have a slight increased rate of decline in FEV 1.0 than smokers without the same occupational exposures. Therefore, it has been concluded with reasonable assurance that occupational exposures to dusts, fumes, and gases make an important contribution to chronic bronchitis and may cause a small increase in the rate of decline in FEV 1.0. The contribution of such occupational exposures to COPD is far outweighed by the contribution of cigarette smoking, however.

In addition to the above analysis, the VHA pulmonary physician concluded, "Based on review of the records provided, the patient smoked 1 to 1.5 packs of cigarettes per day in addition to cigars for 46 years, which would be consistent with him developing severe COPD and respiratory failure [from] which he ultimately died."

The appellant submitted a September 2014 letter from Dr. B, who treated the Veteran during his terminal illness through April 2008. His treatment records are also in the claims file, and noted end-stage COPD from February to April 2008. 

In the 2014 letter, Dr. B stated, "It has recently been drawn to my attention that during his military career as an aircraft pneudraulic repairman, that [the Veteran] had significant and repeated exposures to materials that were potentially toxic to the lungs and certainly could have contributed to his early demise from lung disease." 

Although Dr. B is competent to provide a medical opinion as to the etiology of the Veteran's fatal lung disease, and there is no reason to find his statements not credible, this opinion is too speculative to establish a link to service because he used the phrase "certainly could have." Service connection must be established by at least a 50 percent probability; it may not be based on a resort to pure speculation or a remote possibility of a connection to service. See 38 C.F.R. § 3.102. 

More significantly, Dr. B did not provide any reasoning for his opinion. There is also no indication as to whether he reviewed the Veteran's military or post-service treatment records, to include PFT results and other diagnostic testing and the Veteran's smoking history, or the 2010 and 2012 VA medical opinions and information from medical literature contained therein. Although it is not necessary for a clinician to review the claims folder, the expert must have sufficient facts or data upon which to render an opinion and must reliably apply medical principles to those facts or data, and most of the value of a medical opinion comes from its reasoning. Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 302-04 (2008). For all of these reasons, Dr. B's opinion has very low probative value for the claim on appeal. 

In contrast, the 2010 and 2012 VA physicians' reports reflected consideration of all available evidence and application of medical expertise to an accurate factual history for the Veteran. Id. The 2012 VHA pulmonary physician's report also cited to pertinent medical literature, and the reasoning provided is generally consistent with the medical articles submitted by the appellant. Thus, these medical opinions, particularly the 2012 opinion, have very high probative value and outweigh the less probative opinion of Dr. B and the appellant's non-competent beliefs as a layperson.

In summary, as discussed in detail above, the medical evidence shows that the Veteran died from COPD. Two physicians concluded that this disability was not the result of his military service; that the Veteran did not have lung cancer; and that he did not have a respiratory disorder, to include COPD, that was related to exposure to asbestos, herbicides, or other hazardous materials in service. There is also no competent evidence to suggest that a service-connected condition casually contributed the Veteran's death, to include by rendering him materially less capable of resisting the effects of his COPD. Instead, the VA medical examiner and VHA pulmonary specialist attributed the Veteran's COPD to his smoking history, which occurred during and after service. These conclusions reflected a review of the entire claims file and a detailed discussion of the Veteran's medical history, medical literature as to hazardous exposures, and the appellant's assertions. Moreover, the Veteran's treating providers noted prior to his death, such as in 2003 and 2005, that his main problem was smoking and that smoking would likely result in his death.

Effective since June 9, 1998, service connection is not allowed for death or disability due to the use of tobacco products in service. 38 C.F.R. § 3.300(a). Thus, service connection cannot be granted for COPD based on this smoking history.

For all of the above reasons, the preponderance of the evidence is against the appellant's claim for service connection for the cause of the Veteran's death under any reasonably raised theory. Thus, the benefit-of-the-doubt doctrine is not applicable. See 38 C.F.R. §§ 3.102, 3.312. The Board's decision herein does not in any way negate the importance or appreciation for the Veteran's honorable military service of more than 20 years, or the appellant's support of the Veteran during such service and afterwards. Instead, the Board is bound by applicable statutes and regulations in awarding benefits and, therefore, the appeal must be denied. 

ORDER

Service connection for the cause of the Veteran's death is denied. 

____________________________________________
JAMES L. MARCH
Veterans Law Judge, Board of Veterans' Appeals
Department of Veterans Affairs